UNITED STATES, Appellant

v.

Mr. JOHN G. SCHULTZ, Civilian Appellee

1 USCMA 512, 4 CMR 104

COL. Wendell C. Dreier, USAF, and CAPT. William E. Shannon, USAF, for Appellant.

COL. Kenneth B. Chase, USAF, and MAJ. Abraham S. Robinson, USAF, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused, John G. Schultz, a civilian, was the driver of a car which, in Nagoya, Japan, struck and killed two Japanese pedestrians on August 22, 1950. He was tried by general court-martial[1] in Japan in January 1951, on charges alleging involuntary manslaughter in violation of Article of War 93, 10 USC § 1565, and drunken driving and speeding in violation of Article of War 96, 10 USC § 1568. The accused contested the jurisdiction of the court and declined to plead. By direction of the court, pleas of not guilty were entered. The accused was found not guilty of all the charges and specifications, but guilty with appropriate exceptions and substitutions of negligent homicide in violation of Article of War 96, supra. He was sentenced to pay a fine of $1,000 to the United States and to be confined at hard labor for one year. The convening authority approved and an Air Force board of review has affirmed the findings and sentence. The Judge Advocate General of the Air Force has certified the case to us on the following three issues:

I. Whether the court-martial had jurisdiction of the accused and of the offenses charged;

II. Whether the evidence properly before the court for consideration will, as a matter of law, support the findings of guilty; and

III. Whether, if the findings of

guilty may be affirmed, a sentence may be adjudged greater than that provided by the Japanese occupation statute discussed in the decision of the board of review.

We turn first to a consideration of the jurisdiction of the general court-martial. The accused was a civilian both at the time of the offense and at the time of trial. In this respect, we note again that the party claiming military jurisdiction over a civilian has the burden of establishing that jurisdiction is clearly conferred by Federal statute. United States v. Marker (No. 281), 1 USCMA 393, 3 CMR 127, decided May 19, 1952. Congress has defined, in Article 2(d), 10 USC § 1473, those persons who are subject to military law:

"All retainers to the camp and all persons accompanying or serving with the Armies of the United States without the territorial jurisdiction of the United States, and in time of war all such retainers and persons accompanying or serving with the Armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles; . . ."

Was the accused, in the words of Article 2(d), a retainer to the camp or a person "accompanying or serving with the Armies of the United States"?

The facts in relation to the accused's status are as follows: Accused, a for-

[1] ACM 3786

mer Captain (USAF) and a citizen of the United States, entered Japan on or about January 20, 1947, █ and remained therein in military status, assigned to an Air Force installation, until about January 31, 1950, at which time he was separated honorably from the service. On the latter date he applied for and received a commercial entry permit from the Supreme Commander for the Allied Powers (hereinafter referred to as SCAP) in Japan (GHQ) and on the same day procured from the Tokyo Provost Marshal's Office a commercial entrant's automobile license. During the inclusive period January 21 to March 1, 1950, accused was employed as a club supply salesman for a commercial firm in Tokyo. On or about March 1, 1950, he secured employment as club manager of a nonappropriated fund civilian club in Nagoya, Japan, designated as the Chiyoda Club, and operated under General Headquarters, Far East Command Circular 1, January 19, 1949. The contract of employment embraced the period of March 1, 1950, until September 1, 1950, and provided that accused as club manager would devote "his entire time" to the management of the club, being directly responsible to the Board of Governors, and would operate the same in accordance with its constitution, instructions from the Board of Governors and "applicable orders or directives from military and occupation authorities." Provision was made for compensation and leave and other matters not here pertinent. The concluding paragraph of the agreement provided that accused was to receive upon satisfactory completion of his duties and under certain contingencies "an amount equivalent to the reasonable cost of transportation to the United States." The accident involved in this case occurred on August 22, 1950, and on September 1, 1950, accused "discontinued work" at the club and obtained no further employment. Long prior to this— on May 22, 1950—accused had applied to SCAP at Nagoya, Japan, for a passport. The passport, dated August 11, 1950, was received by the accused during the month of October 1950. On or about October 23, 1950, accused made applica-

tion to the Supreme Commander for an exit permit and received the same with stamped approval dated October 25, 1950, permitting him to leave Japan "before 31 December 1950." Subsequent to the termination of accused's contract of employment, accused resided in "various foreign trader's hotels in Tokyo" and only resided in occupation billets as a guest. His meals were obtained in Japanese restaurants and only occasionally as a guest in occupational messes. He also occasionally played golf as a guest at a course run by Special Services. He did not on or after September 1, 1950, enjoy Government movies, medical care, post exchange or commissary privileges, and serviced his automobile at a nonoccupational station, neither possessing a Quartermaster gasoline card nor procuring gasoline from that source. His license plates, which were issued by the Japanese Government about January 21, 1950, had been paid for in yen, and he possessed a Japanese driver's license. On or about September 14, 1950, he authorized his attorney in fact, among other things, to have his automobile repaired. She caused the same to be repaired at the Post Exchange Garage, Nagoya Air Base. His mail was received through the American Consul, although prior to September 1, 1950, accused had received his mail through the "club." He formerly had a commissary card (during period of August 1948 to April 1949). Upon the termination of his employment at the club he made a claim for compensation representing the cost of return transportation to the United States. He first remained in Japan because he considered himself under "moral restraint" by reason of the incident which had given rise to these charges, although his inquiries with respect to his status were unrewarded. He finally decided that the case had been dropped and determined that he would "go home and see if I could pick up my commission."

Correspondence with respect to jurisdiction was introduced by defense. The basic communication emanating from Headquarters Kobe Base, requested reference of the case to a general court-martial under "Article of War 2 and/or Article of War 12." Through indorse-

ments this reached Headquarters Far East Air Forces, APO 925, which in turn requested the General Headquarters, SCAP to "issue directions as to disposition" of the case. That Headquarters replied on November 3, 1950, that in its opinion accused was a person "attached to or accompanying the armed forces of the United States and consequently not triable by military occupation court unless it is definitely established that he is not subject to court-martial jurisdiction." The indorsement concluded by stating that headquarters could not make a determination of "court-martial jurisdiction" and accordingly "suggested" that the file be forwarded to the officer exercising general court-martial jurisdiction in the area where the incident occurred for appropriate action under the Articles of War.

On November 10, 1950, the court-martial charges which are the subject of this case were preferred. Following that date and pursuant to a warrant of arrest issued through SCAP, accused was taken into custody and thereafter released on his own recognizance.

Clearly, the accused was not a "retainer to the camp." "This subdivision includes such persons as 'officers, servants, newspaper correspondents and telegraph operators.'" United States v. Marker, supra. A more substantial question is presented as to whether the accused was "accompanying or serving with" the Army. These terms connote a direct relationship between the person concerned and the military forces. Ex parte Gerlach, 247 F 616; Perlstein v. United States, 151 F2d 167 (CA3d Cir). The accused here was not directly employed by the armed services either at the time of the offense or at the time of trial. It is, however, urged that his employment as the manager of a non-appropriated fund club brings him within the term "accompanying." There is some merit to this contention. The offense occurred during the period of this employment, but prior to trial the accused had expressly reverted to the status of a "commercial entrant." Paragraph 4 of SCAP Circular No. 22, September 13, 1949, provides that a commercial entrant "is not a member

of the occupation forces or attached to or accompanying such forces." This indicates that he was allowed to merge with the civilian population. The accused's activities after termination of his employment with the club made it clear that, even aside from the SCAP definition, supra, he had severed all connections with the military. Further, this severance occurred prior to the time of commencement of any action with a view to trial. Neither arrest, apprehension, nor filing of charges occurred until weeks after the accident. Headquarters, Far East Air Forces requested the Supreme Commander as late as October 24, 1950, for instructions as to disposition of the matter in view of the doubts expressed as to whether the accused was a person accompanying or serving with the United States Air Force.

It is true that termination of employment with the armed services prior to trial has been held under some circumstances not to deprive the court of jurisdiction over a civilian. Perlstein v. United States, supra, and cases cited therein. However, in all of those cases either some action with a view to trial had been commenced before the accused terminated his relationship with the Armed Forces, or the person concerned was not allowed to merge with the civilian population. Such is not the case here. Even assuming that the accused was, at the time of the offense, directly connected with or dependent upon the activities of the Armed Forces, and thus amenable to military jurisdiction under Article of War 2(d), supra, we think his later change in status and the failure to commence action with a view to trial prior to this change were fatal. This view is buttressed by the action of Congress in the Uniform Code of Military Justice, Article 3, 50 USC § 553, wherein it is expressly provided for the first time that termination of status subject to the Code does not relieve a person of amenability to trial by courts-martial for offenses committed while in that status. The legislative history of this article indicates that such was not the law prior to the enactment of the Uniform Code. Hearings

No. 37 before House Committee on Armed Services on HR 2498, 81st Cong, 1st Sess, p 881; HR Rep No 491, 81st Cong, 1st Sess, p 5. We conclude, therefore, that this court-martial did not acquire jurisdiction over the accused as a person subject to military law under Article of War 2(d), supra.

Can jurisdiction be sustained under Article of War 12, 10 USC § 1483? That article provides in pertinent part as follows:

> "General courts-martial shall have power to try any person subject to military law for any crime or offense made punishable by these articles, *and any other person who by the law of war is subject to trial by military tribunals* . . . ." [Emphasis supplied]

This article must be read in conjunction with Article of War 15, 10 USC § 1486, which states:

> "The provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions, provost courts, or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by statute or by the law of war be triable by such military commissions, provost courts, or other military tribunals."

It will be noted that the concurrent jurisdiction which is preserved for military tribunals other than courts-martial relates to both the offenders and the offenses that "by the law of war [may] be [lawfully] triable" by such other tribunals.

Article of War 12, supra, appears, on its face, to give to general courts-martial exactly the same jurisdiction over violations of the law of war as is accorded to other military tribunals. This view is buttressed by the mention of "concurrent jurisdiction" in Article 15, supra. We are persuaded that Congress intended, by these Articles, to confer on general courts-martial jurisdiction over (1) persons subject to the military law and (2) persons subject to the law of war, *without regard to whether they may also be subject to*

*military law.* Only by this construction can we attribute meaning to the full portion of the articles under discussion.

Under judicially recognized concepts of international law, General MacArthur, as the direct representative of the United States and as Supreme Commander of the Allied occupying powers in Japan, had authority to establish military tribunals in Japan and to give such tribunals jurisdiction over American civilians. This power is derived from the responsibility of the occupying power, under International Law, for the maintenance of law and order in the occupied territory. The Grapeshot, 76 US 129, 19 L ed 651; see Ex parte Quirin, 317 US 1, 87 L ed 3, 63 S Ct 2; In re Yamashita, 327 US 1, 90 L ed 499, 66 S Ct 340. This principle is recognized in Article 43 of the Hague Regulations as follows:

> "The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country." (36 Stat 2306).

In our own history, the military commission was first utilized for the trial of civilians by General Scott in the Mexican War. Winthrop, Military Law and Precedents, 2d ed, 1920 Reprint, at pp 831–833. During the Civil War, these commissions were widely used and were the subject of the litigation involved in Ex parte Milligan, 71 US 2, 18 L ed 281. They were not, however, given Congressional recognition until the 1916 revision of the Articles of War, which provided Articles of War 12 and 15, quoted supra. By this enactment, Congress incorporated by reference, as within the jurisdiction of military commissions, all offenses which are defined as such by the law of war. Article of War 15, supra, and universally recognized concepts of International Law, thus gave to General MacArthur the power to try American civilians in Japan by military commission for offenses in violation of the law of war.

**519**

See In re Yamashita, supra; Ex parte Milligan, supra; Hammond v. Squier, 51 F Supp 227. The accused Schultz, as an American national residing in Japan, could therefore be tried by either general court-martial or by military commission for offenses in violation of the law of war. This conclusion is not altered by the allegations in the specifications laid against the accused that he was "a person serving with the armies of the United States"—an allegation which would indicate an intention by the pleader to subject the accused to trial as a person subject to military law under Article of War 2(d) supra. Jurisdiction is a fact, not a matter of pleading. (Givens v. Zerbst, 255 US 11, 65 L ed 475, 41 S Ct 227.)

It is urged by defense that General MacArthur had, by existing directive, indicated his policies as to trial of American nationals, and that these policies were here violated. The argument is based on the theory that, according to this directive, the accused should have been tried by either an international tribunal or by the Japanese courts. The pertinent directive, SCAP Instruction 2127, October 18, 1950, is entitled "Exercise of Civil and Criminal Jurisdiction" and provides as follows:

"1. *Criminal Jurisdiction over Persons in Japan.* Japanese courts will *henceforth exercise* criminal jurisdiction over all nationals of members of the United Nations, (hereinafter referred to as United Nations nationals), in Japan except for the following, designated as occupation personnel:

"a. Members of the armed forces of any member of the United Nations;

"b. United Nations nationals officially attached to or accompanying and in the service of the occupation forces;

"c. United Nations nationals on official business in Japan;

"d. Members of the immediate families and dependents accompanying the above.
. . . . . . .

"11. *Military Occupation Courts.* a. Military occupation courts may assume criminal jurisdiction, as authorized by the Supreme Commander for the Allied Powers, over any or all nonoccupation personnel in Japan for any and all offenses committed by them."

While we have substantial doubts as to the propriety of subjecting American nationals in an occupied nation to the criminal courts of that nation (Coleman v. Tennessee, 97 US 509, 24 L ed 1118), we reserve these doubts and assume that such action would be proper. We note, however, that General MacArthur reserved discretion in paragraph 11 of SCAP Instruction 2127, supra, to have offenders tried by military occupation courts. Such courts are defined by SCAP Circular No. 17, October 18, 1950, to include military commissions appointed by commanding generals of the occupying forces. This action was taken by General MacArthur in his capacity as SCAP. Nowhere in either of these directives does General MacArthur indicate that he abdicated the power, given to him as an American military commander, to try offenses in violation of the law of war by either non-international military commissions or by general court-martial. That power is vested in him by Act of Congress. As an American commander, he need not find his authority to appoint tribunals for the trial of American offenders against the law of war in SCAP Circular No. 17, supra. This circular should, we think, be construed to be a grant, not a denial, of power. Military commanders authorized by Congress to convene military commissions and general courts-martial have that power regardless of the SCAP Circular, supra, and the latter may be construed to provide, in addition, authority to "commanding generals" to appoint military occupation courts which will thereby become international tribunals. We prefer this construction, since to hold otherwise might well deprive American nationals convicted by any military commission in Japan of their right to seek resort by habeas corpus to the Federal courts of this nation. See Hirota v. MacArthur, 338 US 197, 93 L ed 1902, 69 S Ct 197;

Flick v. Johnson, 174 F2d 983 (CA, DC). It is noteworthy here that General MacArthur requested that this case be forwarded to the officer exercising general court-martial jurisdiction in the area where the incident occurred "for appropriate action under the Articles of War." This is persuasive that he intended to exercise his statutory discretion to order trial under the jurisdiction conferred by the Articles of War.

We turn next to a contention which is not covered by the issues certified. It is urged that our view of the jurisdiction of the court below precludes review by this Court. We hold that this general court-martial had ju- ■ risdiction over the accused as a person subject to the law of war—not as a person subject to military law. It is argued that the benefits of military law— ■ including review by this Court—are available only to persons subject to military law under Article of War 2(d), supra. Support for this view is found in the following language of the Supreme Court of the United States in In re Yamashita, 327 US 1, 19, 90 L ed 499, 511, 66 S Ct 340:

> "By thus recognizing military commissions in order to preserve their traditional jurisdiction over enemy combatants unimpaired by the Articles, Congress gave sanction, as we held in Ex parte Quirin, to any use of the military commission contemplated by the common law of war. But it did not thereby make subject to the Articles of War persons other than those defined by Article 2 as being subject to the Articles, nor did it confer the benefits of the Articles upon such persons. The Articles recognized but one kind of military commission, not two. But they sanctioned the use of that one for the trial of two classes of persons, to one of which the Articles do, and to the other of which they do not, apply in such trials. Being of this latter class, petitioner cannot claim the benefits of the Articles, which are applicable only to the members of the other class. . . . ."

See also the dissenting opinion of Mr. Justice Rutledge, 327 US at 68, 69, 90 L ed 537, 538. There is some merit in this contention. However the Yamashita case was concerned with the application of certain benefits conferred by the law of war to trial by military commission—not to trial by general court-martial. It is distinctly arguable that when Congress gave jurisdiction to general courts-martial in Article of War 12, supra, it did not intend to create two classes of general courts-martial, which would be the necessary result of the defense contention. Even further, it is one thing to say that the benefits discussed in Yamashita are not applicable, and another to say that the review procedure specified by the Articles of War, supra (and insofar as this Court is concerned, the Uniform Code of Military Justice, supra), is not applicable to certain types of general courts-martial. But we do not think this issue is before us. As noted in the first portion of this opinion, this general court-martial was created by virtue of the power vested in military commanders by Congress to try violations of the law of war. We find nothing in the Articles of War or the Uniform Code of Military Justice which prohibits this military commander from forwarding such a case to The Judge Advocate General for legal review, even assuming arguendo, that such review is not made mandatory by the military law. Indeed, such action was expressly allowed by Article of War 47(c), 10 USC § 1518.

Article 66 of the Code, 50 USC § 653, requires The Judge Advocate General to refer to a board of review "every case of trial by court-martial in which the sentence, as approved, . . . extends to . . . confinement for one year or more." Article 67(b) of the Uniform Code of Military Justice, 50 USC § 654, provides as follows:

> "The Court of Military Appeals shall review the record in the following cases: . . . (2) All cases reviewed by a board of review which The Judge Advocate General orders forwarded to the Court of Military Appeals for review; . . ."

If the accused were here on petition for grant of review then he might be claiming a "benefit" under military law, in the terms of the defense contention. But he is not. The case is here on certificate from The Judge Advocate General of the Air Force, in accordance with Article 67(b)(2) set out above. This Court clearly has jurisdiction under this Article. We need not, therefore, and expressly do not decide the issue raised as to which of the benefits conferred by the Articles of War, supra, are applicable in a general court-martial trial of a person not subject to military law for violation of the law of war.

Finally, we turn to a consideration of the offenses. The accused was charged with manslaughter, driving while drunk and speeding. It will be made clear in the ensuing discussion that a military tribunal would have jurisdiction over these crimes as violations of the common law of war and occupation directives. He was not, however, found guilty of any of these offenses. The court convicted the accused, by exceptions and substitutions in the manslaughter specification, on the following specification: "In that John G. Schultz . . . did, at Nagoya, Honshu, Japan, on or about 22 August 1950 . . . unlawfully kill Shinkichi Honma and Akio Nomura by hitting them on the body with an automobile." This crime is, in substance, vehicular homicide by negligent driving.

The law of war grants to military tribunals no power to try American nationals not subject to military law for purely military offenses. Hammond v. Squier, 51 F Supp 227, 231. A military tribunal may, however, take cognizance of two types of offenses under Article of War 12, supra. First are crimes committed against the civilian population which are made punishable by the penal codes of all civilized nations. Second are crimes condemned by local statute which the military occupying power must take cognizance of inasmuch as the civil authority is superseded by the military. Ex parte Quirin, supra; In re Yamashita, supra; Coleman v. Tennessee, supra; Dow v. Johnson, 100 US 158, 25 L ed 632; Garner,

International Law and the World War, Vol. II, page 477.

The first category finds its basis in the customs and usages of civilized nations. Winthrop, Military Law and Precedents, supra, p 773. "The law of war, like civil law, has a great lex non scripta, its own common law. This 'common law of war' (Ex parte Vallandigham, 1 Wall 243, 249) is a centuries-old body of largely unwritten rules and principles of international law which governs the behavior of both soldiers and civilians during time of war." Ex parte Quirin, supra, p 13. In deciding whether a given offense constitutes a crime under the common law of war, we have no single source which will provide a ready answer. This law is nowhere precisely codified. We note, however, that certain crimes are universally recognized as properly punishable under the law of war. These include murder, manslaughter, robbery, rape, larceny, arson, maiming, assaults, burglary, and forgery. See Rules of Land Warfare, War Department Field Manual 27–10, paragraph 355; Winthrop, Military Law and Precedents, supra, p 842; United States v. Yabusaki, 67 BR 265, 271; Dig Op JAG 1912, p 1071. The test bringing these offenses within the common law of war has been their almost universal acceptance as crimes by the nations of the world. This test is consistent with the rule, already noted, that the common law of war has its source in the principles, customs, and usages of civilized nations.

We know of no authority for the proposition that the list of crimes denounced above is either all-inclusive or unchanging. By definition, the law of war must be a concept which changes with the practice of war and the customs of nations. It is neither formalized nor static. "Until a more complete code of the laws of war has been issued, the High Contracting Powers deem it expedient to declare that, in cases not included in the Regulations adopted by them, the inhabitants and the belligerents remain under the protection and the rule of the principles of the law of nations, as they result from the usages established among civilized

peoples, from the law of humanity, and the dictates of the public conscience." Preamble to the Hague Convention, No. IV, of October 18, 1907, 36 Stat. 2295. It is therefore no obstacle to finding a particular offense to be a violation of the law of war that it has not yet been precisely labelled as such. On the other hand, of course, we are not free to add offenses at will. In deciding whether an offense comes within the ▮▮▮▮▮ ▮ common law of war, we must consider the international attitude toward that offense. The power to define such offenses is derived from Articles of War 12 and 15, supra, and it is no objection that Congress has not codified that branch of international law or defined the acts which that law condemns. Ex parte Quirin, supra, pp 28–29.

This accused was convicted, in substance, of homicide through negligent operation of a motor vehicle. By the court's findings, there is indicated an intent to find the accused guilty of a crime of a lesser degree than involuntary manslaughter. The question before us is whether the common law of war includes such an offense. We note first that all of the crimes which, historically, have been treated as violations of the law of war include an element of animus criminalis. Negligent homicide or vehicular homicide, as the term is commonly used, does not include such an element. This is, however, not necessarily determinative. We shall assume that a crime may become a violation of the law of war if universally recognized as an offense even though it contains no element of specific criminal intent.

A careful perusal of the penal codes of most civilized nations leads us to the conclusion that homicide involving less than culpable negligence is not universally recognized as an offense. Even in those American jurisdictions—still relatively few in number—which have given statutory recognition to either negligent homicide or vehicular homicide, the degree of negligence required is often held to be "culpable" or "gross" —the same as that required for invol-

untary manslaughter. Imposing criminal liability for less than culpable negligence is a relatively new concept in criminal law and has not, as yet, been given universal acceptance by civilized nations. Risenfeld, Negligent Homicide—A study in Statutory Interpretation (1936) 25 Calif Law Rev 1; Moreland, A Rationale of Criminal Negligence (1944).

We turn next to a consideration of the second branch of offenses which may be punished by a military tribunal under the law of war. This includes those acts which are rendered punishable by the law in effect in the occupied territory. The "law in effect" may be either existing valid occupational directives or those statutes of the occupied nation which are continued in existence by the occupying power. Under this branch of law of war jurisdiction, the military tribunal acts as a substitute for the regular criminal judicature. Dow v. Johnson, supra; Dig Op JAG 1912, p 1067; see Rules of Land Warfare, Field Manual 27–10, paragraph 282; United States v. Yabusaki, supra.

Negligent homicide is made an offense by the Japanese Penal Code. Article 210 of that Code provides that "a person who causes the death of another through negligence shall be punished with a fine of not more than fifty thousand yen." Constitution, Penal Code and Essential Laws for the Correction of Offenders in Japan, Attorney General's Office, Tokyo, Japan, 1950. General MacArthur, as SCAP, has expressly ordered that the Japanese Criminal Code should remain in effect during the occupation. SCAP Circular Nos. 8 and 18, and SCAP Instruction 2127, supra. A military tribunal, including a general court-martial, therefore had jurisdiction to convict an accused of negligent homicide in violation of the Japanese criminal law. It is immaterial that the finding of negligent homicide here was laid as a violation of the Articles of War, supra. Jurisdiction is neither vested nor divested by the formalities of pleading. Givens v. Zerbst, supra. If

**523**

a specification states an offense in violation of the law of war, categorizing it as a violation of military law is not a fatal defect. See Johnston v. Biddle, 12 F2d 366, 370 (CA8th Cir); Manual for Courts-Martial, United States, 1951, p 471. Further, SCAP Circular No. 17, supra, providing the rules for military occupation courts trying offenders for violations of the law of war, states that offenses shall be alleged in the form of charges and specifications. A fortiori, therefore, a general court-martial trying offenses under the law of war should follow the same procedure. See Winthrop, Military Law and Precedents supra, p 842. It follows from what we have said above that this general court-martial had jurisdiction over both the accused and the offense. The first question certified is, therefore, answered in the affirmative.

Defense contends, however, that our view of jurisdiction below results in unfairness to the accused, since he was charged with an offense under the Articles of War, supra, but is, by virtue of our holding, convicted under an entirely different statute which was not considered by the trial court. We find no merit in this contention. It is not necessarily fatal that the statutory bases of the crimes are different. Taylor v. United States, 2 F2d 444 (CA7th Cir), cert den, 266 US 634, 69 L ed 479, 45 S Ct 226. The test must be whether the accused was prejudiced. Mathews v. United States, 15 F2d 139 (CA8th Cir). We do not have a situation here where the statutes differ in policy. See United States v. Stafoff, 260 US 477, 481, 67 L ed 358, 43 S Ct 197. Both the Articles of War and the Japanese Criminal Code condemn killing through negligence. The accused was sufficiently informed by the charge of involuntary manslaughter that he should be prepared to defend against the lesser included offense of negligent homicide. Finally, our view of the evidence, to be spelled out infra, convinces us that there is here compelling proof of gross or culpable negligence. This accused could not, therefore, be prejudiced by a finding based on the Japanese statute whatever the degree of negligence required by the Japanese courts for conviction under the statute. We conclude that this accused was not misled to his prejudice by the charges and findings based on the Articles of War. See United States v. Hutcheson, 312 US 219, 85 L ed 788, 61 S Ct 463; Williams v. United States, 168 US 382, 389, 42 L ed 509, 18 S Ct 92; Gaunt v. United States, 184 F2d 284, 289 (CA1st Cir).

This brings us to the second issue—whether the evidence will support the findings of guilty. The evidence of record may be summarized as follows. On the evening of August 22, 1950, accused attended a birthday party at the home of Captain and Mrs. Jack Dundas, House 34, Nagoya, Honshu, Japan. He arrived at the party at approximately 9:30 p.m., but left shortly thereafter to return to the Chiyoda Club, of which he was manager. Accused was absent from the party for approximately one hour. When he returned, he brought with him a bartender, Utaro Arai, and some drinks, including whiskey, coke, soda, and ginger ale. Arai took the "drinks" to the bar inside the Dundas home and began to mix drinks for the guests. Between 11:30 p.m. and 11:45 p.m., the guests departed for town in two cars: one, an Oldsmobile belonging to and driven by accused, and the other a DeSoto, driven by a Sergeant Vinson. Accused's vehicle departed shortly before the other. Accused and Miss Madigan were seated on the front seat, and Miss Malone, Sergeant Warrensford and Utaro Arai were seated in the rear. At approximately 11:30 p.m., while proceeding through a populated business section toward the center of the city, the car driven by accused was involved in a collision with a bicycle and two Japanese pedestrians. The collision occurred on 6th Avenue South at the intersection of 4th Street East, in the city of Nagoya. It resulted in the death of Akio Nomura and Shinkichi Honma. Dr. Yoki Wataru, a medical doctor at Nagoya University Municipal Hospital, conducted autopsy examination of the two victims, and concluded that death resulted from injuries which were caused by some large object which was in motion.

The parties stipulated that the lawful speed limit at the place of the incident, as established by occupation authorities and as appropriately posted, was thirty miles per hour. The incident was witnessed by several persons who testified before the court. Suesaburo Yamada was seated on the sidewalk bordering 6th Street at a point just east of the scene of the incident. He observed accused's vehicle as it passed down the street in front of him, and continued to observe it until it was involved in the collision. Yamada was impressed by the speed of the vehicle, which he estimated to be approximately fifty miles per hour. The lights on the vehicle were burning at the time of the incident. On cross-examination, Yamada testified that he did not drive vehicles, but had ridden in them.

Takujiro Inoue was seated on the sidewalk within a short distance of Yamada, when he observed accused's vehicle approaching from the East, and continued to observe it as it passed in front of him. He estimated the speed of the vehicle to be fifty to sixty miles per hour. Inoue had driven small cars in the past, but did not have a driver's license. Fukumoto Kazuo was standing on the northwest corner of 6th Avenue South and 4th Street East when he observed accused's vehicle approaching at a distance of four or five hundred meters. The lights on the vehicle appeared very bright and its motor made the sound of a "fast-traveling motor." Kazuo immediately looked to see if any pedestrians were using the intersection, and he saw two men crossing the road at that point. The men were walking side by side, and one of them was pulling a bicycle. As the vehicle approached them, they backed up two or three meters. The sound of the squealing tires could be heard just before the vehicle struck the two men. Kanako Kayakawa was sitting on the southeast corner of the intersection at 6th Avenue South and 4th Street East and observed accused's vehicle approaching the intersection. She was curious, because the vehicle was travelling "so fast," and she saw it when it collided with the two men. Masako Toyama was inside her store when she heard a loud noise. She ran outside in time to see accused's vehicle slow down, and she observed a body fall from it. The driver of the vehicle looked out of the car window at the body and then pulled the car over to the right side of the street and parked it.

Shortly after the incident occurred, Japanese and military policemen arrived. They found the accused's car parked along the righthand side of the 6th Avenue South, some considerable distance west of the 4th Street East intersection. The hood, grill, and left front fender of the car were damaged, and the ventilator window on the left front door was broken. The left front door post was bent toward the rear approximately one and one-half inches, and on it was blood. There were automobile skid marks on the south side of 6th Avenue South, beginning approximately one hundred feet east of the 4th Street East intersection, and continuing through the intersection to a point approximately one hundred and forty-five feet beyond it. The skid marks on the west side of the intersection were partly on the trolley car tracks which ran in the middle of the street. At one point the vehicle made four skid marks, indicating that the back had swung around and was not following the front. After the vehicle went onto the trolley car tracks, there were skips in the skid marks where the tires appeared to bounce and not make full contact with the surface. Although there is some variance between the testimony of the different witnesses, it clearly appears that the skid marks extended a distance of from two hundred twenty to two hundred forty feet. The distance from the point in the intersection where the collision occurred to the body of the nearest victim (Shinkichi Honma) was approximately forty-five feet. From this point to the location of the body of the farthest victim (Akio Nomura) was approximately one hundred thirty-five feet. It was approximately ninety feet from the body of Honma to the end of the skid marks.

Mr. Alexander E. Cabana, Ground Safety Director, Nagoya Air Base, testified that he had been in safety work for approximately ten years. This work

included aircraft and automotive safety, and he had made studies in the field of braking distances of automobiles, having read numerous textbooks on this subject. In the past he had made actual tests on jeeps and on vehicles which had been involved in accidents, including a vehicle of the same type as accused's on the same type surface as that existing at the place of the incident. The street at the place of he incident was surfaced with macadam, but under the streetcar tracks in the center of the street, there was cut stone (cobblestone). In his opinion, a vehicle of the same type as that involved in the incident must have been travelling in excess of sixty miles per hour to make skid marks of about two hundred forty feet in length along the road in question.

Technical Sergeant Lucien G. Edwards, an air policeman who had been in police work for approximately ten years, observed accused at the scene of the accident. He smelled alcohol on accused's breath and, in his opinion, accused was drunk. His speech was "thick, slurred and incoherent." Accused "wobbled" when he walked. Later, at the Provost Marshal's Office, accused appeared to be "regaining himself to . . . some extent," but he still was in a drunken condition. Corporal Mabrey W. Poole, an air policeman who had been in police work for approximately three years, observed accused at the Provost Marshal's Office at about 2:00 a.m. He smelled whiskey on accused's breath, and accused appeared to be drunk. When accused walked he staggered and he talked "thick-tongued."

Corporal Smith, a military policeman, observed accused at the scene of the incident and thought accused to be under "the influence of alcohol." Accused's breath smelled of alcohol, his speech was slurred, and he spoke as though he had something in his mouth. Corporal Smith observed accused at the Provost Marshal's Office about three hours later and, at that time, accused appeared to "walk straight." Private Marvin E. Shoup accompanied accused from the scene of the accident to the hospital for a sobriety test. He smelled alcohol on

accused's breath and observed that accused's eyes were "a little bloodshot or misty."

Captain Bernard S. Duval, a medical doctor, examined accused at about 12:45 a.m. on August 23, 1950, at the 395th Station Hospital to determine his condition of sobriety. He smelled liquor on the accused's breath and accused's coordination was slighty impaired. In the captain's opinion, accused was "slightly drunk."

Sergeant McNary, a laboratory technician at the 395th Station Hospital, made a blood alcohol test of a sample of accused's blood on the night in question, and determined the alcohol content to be two milligrams per centimeter. This test was confirmed the following morning by a Chinese medical doctor, who was employed in the hospital laboratory. When McNary took the blood sample from the accused, accused appeared to be moderately intoxicated. He was incoherent, used rambling sentences, and "seemed more or less hysterical."

At about 9:00 a.m. on August 23, 1950, accused made a sworn, written statement to Captain Frederick F. Dean, 422d Air Police Squadron. This statement appears to have been voluntarily given. Accused stated as follows:

"At approximately 0030 hrs this date while turning into a main street from a 45° angle I apparently hit a pedestrian (the word apparently is used because the pedestrian was not seen due to the blind spot at the left of the windshield). The bump caused me to momentarily turn my head and as I again brought my attention to the road an object flashed in front of me. I spun the wheel of the car to the right but was too late. I hit this man while in the turn—"

On or about the 5th of September accused came to the Office of Major William A. Buechner, then Base Legal Officer, Nagoya Air Base, to see the "PMO report of the accident." Major Buechner showed him this report and commented to the effect that certain discrepancies existed as to the direction in which he had been travelling; wheth-

er he had proceeded down Ishikawa Road or 6th Avenue South. Accused volunteered information to Major Buechner to the effect that he had been travelling on 6th Avenue South. Accused further stated that he came over the top of a hill just before the collision and that the light from his headlights did not come back down on the road until he was "on top of" the two pedestrians. Major Buechner had made a trip to the location of the incident, as shown on Prosecution Exhibit 2, and there observed that there was a crest, or slight hill, about one-third of a mile east of the intersection of 6th Avenue South and 4th Street East, but from that crest to the intersection the road was straight and level.

The evidence presented by the defense confirms to some extent the evidence of the prosecution, to the effect that accused attended a party at the Dundas home on the evening in question, and that while returning from the party to the city of Nagoya, accused's vehicle, of which he was the driver, was involved in a collision with two pedestrians. However, it differs materially as to the circumstances surrounding the incident. These witnesses testified that the accused was not drunk, and that the automobile was travelling between 25 and 30 miles per hour at the time of the accident. The prosecution endeavored to discredit these witnesses by showing that they were friends of the accused who had attended the party prior to the accident.

The accused, after having his rights as a witness in his own behalf explained to him, elected to make an unsworn statement. He stated to the court that it was his desire to bring before them his exact version of how the incident occurred. On August 22, 1950, Captain Dundas told him that he would like to have an informal gathering of his wife's friends at the Dundas' home, inasmuch as it was his wife's birthday. Accused made the necessary arrangements, including contacting friends to invite them to be present. When he arrived at the Dundas' home accused set up the bar to serve drinks. He noticed that they were short on some supplies, ice and coke, and he drove back to the club to pick up additional supplies. While the employees of the club were preparing the supplies, he ate. This took from one-half to three-quarters of an hour, after which accused returned to the Dundas' home, bringing with him Dick Arai. While at the Dundas' home accused had two drinks. At approximately 11:15 p.m., the group broke up and accused turned his car around and started home. The next thing accused remembered was a flash in front of his face, at which time he spun the steering wheel to the right and applied the brakes. He remembers a sensation as though the rear end of the vehicle was slipping. He released the steering wheel and pumped the brakes "very easily." The vehicle struck something and was immediately stopped, accused jumped out, and found a man lying on the ground. Accused remembered an ambulance and military police arriving at the scene of the incident, and the next thing he remembered was the "OD" asking him to go to the hospital to take a blood test. After taking the blood test he returned to the Provost Marshal's Office, where he talked to the people there in an effort to determine what had happened. He volunteered what information he could at the Provost Marshal's Office and about 2:00 a.m. August 23, he was released and went to the Kanko Hotel, where he talked with Father Malloy (Catholic Chaplain). Accused stated that he drank a lot, but that on the night in question he had only two drinks and it was "impossible for me to be drunk, impossible for me to have any senses impaired whatsoever." The following morning he returned to the Provost Marshal's Office, where he made a statement to Captain Dean. In the past, when he had gone to the Dundas' home he had used Ishikawa Road, and the only way that he could visualize the incident happening was that, after he came off of Ishikawa Road, he failed to see the first pedestrian, being blinded by the left side of his windshield. Accused decided that this drew his attention from the road and, as a result, he hit the second pedestrian. He stated that he actually didn't know how the accident happened, but had been trying

to reason it out at Captain Dean's office. After hearing the testimony presented in this case accused was of the opinion that the incident happened as follows:

"There is a hole just before the impact, what I thought I felt was a bump, which the morning after I thought was hitting the first man, was my front wheels going into the hole. At night I didn't. see the hole, but, as my front wheels hit the hole, feeling the bump, momentarily either my eyes were diverted or, for some reason, they were not focused right in front of the car. As soon as that first sensation caused by the hole· passed, then I got a flash of the two people. Then the wheel was spun and the brakes were applied, and I do have a memory of pumping the brakes till the car came to a halt. I got out of the car somewhere around the car tracks and went over, as I stated before, to try to help the man. That statement 1 made at the PMO, as I say, was putting my forced thoughts on paper."

The accused stated further that he had gone very fast before in Nagoya, but on the night in question, he knew he was under the thirty-mile-an-hour speed limit. The statement which accused made to Major Buechner was to the effect that it was the opinion of Captain Dean or Mr. Pete Hoskins, of the Provost Marshal's Office, that it was possible his lights were on high-beam and did not strike the victims until the car came over the rise. He did not state to Major Buechner that such was his opinion. The morning after the accident he resigned his job at the Chiyoda Club, but was told to take a vacation and, after things were all over, to come back. After waiting three weeks or a month ·to determine what disposition would be made of his case, he went to Tokyo, where he made arrangements for the family of one of the victims to get 350,000 yen; the family of the other to get 300,000 yen. He remained in Tokyo, waiting for word on the disposition ·of these charges. After making many telephone calls and getting a "million different answers," he began to think about his

family back in the States. He was getting short of cash, inasmuch as trying to live outside of the occupation cost him from $10 to $15 a day. He continued to remain unemployed until the time of this trial, and it had cost him over $2,000 "to stay here in Japan, waiting for this thing to come up." In conclusion, accused stated that he did not know how the accident happened, but that he did not break any speed laws. and was not driving while intoxicated. Neither can he explain what occasioned his loss of memory at that time.

There is no question from the evidence that the accused did drive the vehicle that struck the two Japanese and that the persons struck by the accused are the persons named in the specification. That the two victims are dead was established by competent evidence. It was also clearly shown that the deaths were caused as a result of injuries sustained by being struck by the accused's automobile. The only question remaining, therefore, is whether the accused was guilty of negligence. The evidence was conflicting as to the speed at which accused was travelling at the time of the accident. The speed limit at the scene was thirty miles per hour. Several prosecution witnesses, however, testified that the speed was considerably in excess ·of thirty miles per hour. That the speed was excessive is borne out by the physical evidence of extensive damage to the vehicle, the distance the victims were thrown from the point of impact and the length of the skid marks. There was positive evidence, even aside from the observations of witnesses, as to the degree of intoxication of the accused. The blood alcohol test showed two milligrams of alcohol per centimeter. Simmons and Gentzkow, in Laboratory Methods of the United States Army, page 344, state that "at the level of 2 to 2.5 mg. (of . alcohol per cc. of blood) an individual may be regarded as definitely intoxicated." In Gray, 1 Attorney's Textbook of Medicine (3d ed) 615, the author sets out a table which he states represents "generally accepted standards of alcohol within the body now utilized by courts in nearly all states.", This table contains the following: · . ·.

"0.15% or less. (above 0.05% should not drive.)

"0.15% and over. Should be prosecuted as definitely drunk. (about 6–7 ounces whiskey or 6–7 bottles beer.)

"0.2% dizzy or delirious."

0.2% is the equivalent of 2.0 mg. per cc. of blood. McNally in Medical Jurisprudence and Toxicology, p 262, states that 0.2% is the "characteristic state of drunkenness." For further discussion of these standards, see the Medico-Legal Aspects of the Blood Test to Determine Intoxication, 24 Iowa L Rev 191. From the evidence of the blood test and the testimony of eyewitnesses, this court could well have determined that petitioner was drunk at the time of the accident.

It is undisputed from the evidence that this accident occurred in the nighttime on a well-travelled public street in a populated area. It is common knowledge and is reflected by the record that bicyclists and pedestrians appear on the streets of Japanese cities in a much larger number than in American cities. The accused, by virtue of his period of residence in Japan, must have known of this situation and may legally be required to observe in his driving a standard of care consonant with the customs of city street usage in Japan.

The accused's vehicle struck the victims well out in the street. The testimony of the accused himself shows that he did not see the people, if at all, until just before he struck them. He did not know how the accident happened, and it is clear from his own statements that he failed to maintain a proper lookout. The road along which petitioner was travelling at the time of the accident was broad, straight, and level.

There is ample evidence in the record, therefore, to support a conclusion by the trial court that (1) the accused was driving while intoxicated; (2) that he was driving at an excessive and reckless speed; and (3) that he failed to maintain a proper lookout. That there is some evidence to the contrary on these factors is not controlling. We have no power to weigh the evidence and determine the credibility of witnesses. United States v. O'Neal (No. 25), 1 USCMA 138, 2 CMR 44, decided February 7, 1952. Where the evidence is conflicting and where the accused has been found guilty, we are required as an appellate court to resolve such conflicts in favor of the Government. We may note, however, that in our opinion the preponderance of the evidence establishes that the accused drove recklessly while intoxicated. Indeed, there is sufficient evidence to warrant a finding that the accused was guilty of gross and culpable negligence. See Graham v. State, 27 Ala App 505, 176 So 382; State v. Ponce, 59 Ariz 158, 124 P2d 543; People v. Freeman, 16 Cal App2d 101, 60 P2d 333; Stevens v. People, 97 Colo 559, 51 P2d 1022; Powell v. State, 193 Ga 398, 18 SE2d 678; Jackson v. State, 58 Ga App 379, 198 SE 552; People v. Pierce, 369 Ill 172, 15 NE2d 845; Jones v. Commonwealth, 273 Ky 444, 116 SW2d 984; Cowan v. State, 140 Neb 837, 2 NW2d 111; State v. Peterson, 212 NC 758, 194 SE 498; Hatley v. State, 133 Tex Cr R 232, 109 SW 2d 1062.

Our conclusion as to the sufficiency of the evidence is not altered by the fact that the court found the accused cused not guilty of those specifications which charged drunken driving and speeding. These findings were not inconsistent with a finding of guilty as to vehicular homicide through negligence. See Dunn v. United States, 284 US 390, 76 L ed 356, 52 S Ct 189, 80 ALR 161. No principle of res judicata is involved here. See Sealfon v. United States, 332 US 575, 92 L ed 180, 68 S Ct 237. Court-martial procedure allows one transaction to be made the basis for two or more charges or specifications where doubt exists as to the facts or the law. Manual for Courts-Martial, US Army, 1949, paragraph 27. No objection was made at the trial here on grounds of multiplicity. The trial court may well have decided that it would have been improper to convict the accused of drunken driving and speeding, and also of a homicide arising out of those acts. If they had not eliminated the lesser offenses, a serious question of multi-

plicity would be presented. See Manual for Courts-Martial, United States, 1951, paragraph 76a. Under no ascertainable theory can we conceive that the findings on the driving while drunk and speeding specifications preclude this court from considering evidence in relation to intoxication and speeding on the findings of vehicular homicide through negligence. Steckler v. United States, 7 F 2d 59, 60 (CA2d Cir); United States v. Ambabo, 2 CMR(AF) 646, 663; United States v. Green, 2 BR–JC 53, 63; Comment, Judge and Jury—Inconsistent Verdicts in the Federal Courts, 63 Harvard Law Review 649.

Under our view of the evidence, set out in detail, supra, there is here ample evidence to support a conclusion that the accused was guilty of negligent homicide, regardless of whether a standard of simple, ordinary, or culpable negligence is applied. Accordingly, the conviction may not be set aside for insufficient evidence. The second question certified is answered in the affirmative.

The third issue certified is "whether . . . a sentence may be adjudged greater than that provided by the Japanese occupation statute discussed in the decision of the board of review." This accused was sentenced to one year's confinement and a fine of $1,000. The Japanese statute punishing negligent homicide would allow only a fine of 50,000 yen (approximately $140 at the prevailing rate of exchange). Defense urges that, under our view of the jurisdiction of the court-martial, the sentence is illegal in that it exceeds that allowed by the Japanese statute.

We do not think that this court was bound to observe the punishment limitation imposed by the Japanese law. Article 18 of the Uniform Code of Military Justice, 50 USC § 578, provides that a court-martial, sitting as a military commission, may adjudge any punishment permitted by the law of war. Although this provision is not of itself applicable to this trial, which occurred before the effective date of the Uniform Code, it does not set out a new

principle but merely codifies pre-existing law. Winthrop, Military Law and Precedents, supra pp 842–843; Manual for Courts-Martial, US Army, 1949, paragraph 117. SCAP Circular No. 17 supra, provides that a military commission in Japan may impose any sentence up to death, including fines in any amount or imprisonment up to life. See also SCAP Instruction 2127, supra, paragraph 11(b). It is not necessarily unreasonable that an American citizen may be given a more severe penalty when tried by military commission than could be accorded if trial were by the Japanese courts. The Supreme Commander has discretion, carrying out the objectives of the occupation, to punish crimes under the law of war at his discretion, within limitations consistent with American judicial traditions and international convention. See Manual for Courts-Martial, United States, 1951, paragraph 14(b), which states the pre-existing law in this regard. In SCAP Circular 17, supra, paragraph 14(a) states as follows:

". . . In any case where any act or omission is made unlawful by the law of occupation, the same may be punished as a military occupation court may direct."

A general court-martial exercising jurisdiction concurrent to that of a military commission is bound by the same rule. Under the law of war, General MacArthur had the power, as noted above, to determine punishment policies for military tribunals. The sentence here does not exceed the limitations set out by him. SCAP Circular 17, supra. The sentence is, therefore, legal. The appropriateness of the sentence is a matter for military authorities. We need only note that it is not materially at variance with either military law or Federal standards. Manual for Courts-Martial, US Army, 1949, paragraphs 116g, 117c; DC Code, 1940 ed, Sec 40–606. The latter statute provides that negligent homicide may be punished by imprisonment for not more than one year and/or a fine of $1,000. The third issue certified is, therefore, answered in the affirmative.

The questions certified have all been

answered in the affirmative. We have examined the record carefully for prejudicial error and find none. Accordingly, the decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.