UNITED STATES, Appellee

v.

DOROTHY K. SMITH (Dependent wife of Colonel Aubrey D. Smith, deceased), Appellant

5 USCMA 314, 17 CMR 314

No. 3370

Decided December 30, 1954

BRIG GEN Adam Richmond, U. S. Army (Retired), LT COL George M. Thorpe, U. S. Army, and 1ST LT John W. Fuhrman, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, JUDGE:

A general court-martial convened at Tokyo, Japan, found the accused woman guilty of the premeditated murder of her husband, Colonel Aubrey D. Smith, United States Army—in violation of the Uniform Code of Military Justice, Article 118, 50 USC § 712. She was sentenced to be imprisoned for life. The convening authority approved the findings and sentence, and a board of review has affirmed. This Court granted her petition for review of the case.

II

At the trial, the defense assailed the jurisdiction of the court-martial over this civilian accused—and the same matter has been raised here. In this connection we observe that, at the time of his death, Colonel Smith was stationed in Tokyo, and that the accused was there as his dependent. Therefore, at all times prior to his death, she was accompanying the Armed Forces, within the meaning of Article 2(11) of the Uniform Code, 50 USC § 552. Accordingly, she would have been subject to trial by a court-martial. See Madsen v. Kinsella, 343 US 341, 96 L ed 988, 72 S Ct 699.

We do not perceive how this status terminated at any time before the accused's trial. Colonel Smith died at about 6 a.m. on the morning of October 4, 1952. Mrs. Smith was then in military custody and under guard as a result of having assaulted him several hours before. She remained a prisoner —or at least was hospitalized in a military medical facility—until the date of the trial. Thus, she cannot be said to have "merged" with the Japanese population—with the result that she must have remained subject to military jurisdiction. See United States v. Garcia, 5 USCMA 88, 17 CMR 88; United States v. Schultz, 1 USCMA 512, 4 CMR 104. Indeed, the circumstances establishing jurisdiction are much stronger here than in the Garcia case, and our discussion there—together with the opinion of the board of review in the instant case[1]—fully disposes of the jurisdictional contention.

III

The accused also complains that fatal

---

[1] 10 CMR 350. In view of our holding on this point we need not consider claims of military jurisdiction grounded on Article 3 of the Uniform Code, 50 USC § 553. That Article—providing for continuance of jurisdiction over serious offenders who cannot be tried by American civilian courts—was recently upheld by the Court of Appeals for the District of Columbia, Toth v. Talbott, 215 F2d 22, cert granted 348 US 809, 99 L ed —, 75 S Ct 39.

error was committed in admitting in evidence a statement made by Colonel Smith to his Japanese maid to the effect that his wife had stabbed him. The maid had been called late at night by Colonel Smith and discovered him lying in bed disabled by what proved to be a knife wound. Since it is improbable that there was any sort of expectation of death on the Colonel's part when he made the remark, we feel sure that its language was inadmissible as a dying declaration. See Manual for Courts-Martial, United States, 1951, paragraph 142*a*; United States v. De-Carlo, 1 USCMA 91, 1 CMR 90.

However, a forceful argument has been made for the reception of the deceased's utterance as a spontaneous exclamation, made under circumstances reflecting no occasion to deceive. See Manual, supra, paragraph 142*b*; United States v. Mounts, 1 USCMA 114, 2 CMR 20. While we incline to accept this view, we shall assume arguendo that the law officer erred in admitting the statement. Yet the comment of Colonel Smith pertained only to the identity of his assailant. The evidence—forthcoming from both Government and defense witnesses[2]—was so overwhelming on this point that any error relating to identity becomes quite insignificant. As revealed by the evidence, as well as by the closing arguments of counsel, the only real issue at the trial was the state of mind—the mental condition—of the accused when she stabbed the Colonel. Since his statement sheds no light whatever on this subject, its reception could not have been prejudicial.

## IV

A further assault has been made in this Court on the principles of military law dealing with mental responsibility—one stemming chiefly from a recent thoughtful and scholarly opinion of the United States Court of Appeals for the District of Columbia. Durham v. United States, 214 F2d 862. Prefatory to a consideration of this attack, it must first be noted that the long-established military test of mental responsibility is phrased in terms of whether the accused was, at the time of the alleged offense, so far free from mental defect, disease, or derangement as to be able, concerning the particular acts charged, to distinguish right from wrong and to adhere to the right. Manual, supra, paragraph 120*b*; Manual for Courts-Martial, U. S. Army, 1949, paragraph 110*b*; Manual for Courts-Martial, U. S. Army, 1928, paragraph 78*a*. See also Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 294–6.

Emphasis is placed—it will be observed—on the distinction between the "mental defect, disease, and derangement," which may exculpate from criminal liability, and the "mere defect of character, will power, or behavior," which will not serve to exonerate an accused. This distinction meshes well with the content of the Joint Armed Forces' Definitions of Psychiatric Conditions, promulgated in June 1949—only a short time after the appearance of the 1949 Manual for Courts-Martial.[3] These Definitions include a generic group of "character and behavior disorders"— among them those which theretofore had been termed "pathological personality" types, as well as types previously regarded as suffering from a "constitutional psychopathic state" or a "psychopathic personality." See SR 40–1025–

---

[2] The psychiatric testimony having to do with Mrs. Smith's personality disorders—which occasionally eventuated in aggressive acts against others—itself suggests strongly that she committed the instant homicide. In addition to inclination, she possessed opportunity for the misdeed. Also, she was seen with the death weapon, an Okinawan knife which she had requested the Japanese maid to seek and deliver into her possession several days

prior to the homicide. As if to remove all conceivable doubt of her guilt, Mrs. Smith made numerous admissions having to do with the fatal stabbing, such as, "It is too bad I did not get him in the heart." The board of review sets out a lengthy and detailed presentation of the evidence in its original opinion in the case, printed at 10 CMR 350.

[3] SR 40–1025–2; NAVMED P–1303; AFR 160–13A, dated June 1949.

2, paragraph 6. We construe the character and behavior disorders, dealt with in the Joint Definitions, as simply forming the medical prototypes of the 1951 Manual's reference to "character and behavior disorders." Cf. United States v. Poe, 68 BR 141. Indeed, those Definitions, when considered in conjunction with the Manual for Courts-Martial, provide the psychiatric witness before a court-martial with an infinitely clearer picture of what is, or is not, a mental disease than is afforded him in any civilian system of law administration of which we are aware. This clarity, of course, leads to greater agreement among psychiatric witnesses in military law administration, and operates sharply to reduce the occasions for courtroom battles of alienists.[4]

The opinion of the Court of Appeals in Durham v. United States, supra, requires that unless the jury "believe beyond a reasonable doubt either that he [the accused] was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity." Disease is said to signify "a condition which is considered capable of either improving or deteriorating," while a defect exists when there is present a condition "not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease."

It is evident that the law of mental responsibility, as it now exists in the District of Columbia, is far more liberal than the traditional common law view, or than that obtaining in most American jurisdictions. Under the McNaughten Rules—which reign in a majority of states, as well as in England —an accused is deemed responsible for his acts if, at the time of their performance, he knew the difference between right and wrong with respect thereto, as well as the nature and quality of those acts.[5] Weihofen, Mental Disorder as a Criminal Defense, 1954, chapter 3. A number of states, as well as the Federal courts, also exonerate from criminal liability for acts committed as the result of an irresistible impulse. Davis v. United States, 165 US 373, 141 L ed 750, 17 S Ct 360; Weihofen, supra, pages 81–100.

So far as can be determined, the principle of the Durham case receives legal support in the United States almost exclusively from certain New Hampshire decisions. See, e.g., State v. Pike, 49 NH 399. Scotland, too, seems to apply a like doctrine. Also a Report of the British Royal Commission on Capital Punishment, 1949–1953, favors the particular extension of the McNaughten Rules which is embodied in the Durham decision. Incidentally, a survey of this very excellent Report—as well as the voluminous Minutes of Evidence submitted to the Royal Commission—makes clear that the Court of Appeals for the District of Columbia was substantially influenced thereby.

We have indicated elsewhere that for the military establishment the law determining mental responsibility is not an open question. United States v. Kunak, 5 USCMA 346, 17 CMR 346. In the Federal civilian system Congress has legislated on certain procedural matters having to do with insanity. 18 USC §§ 4241–8; DC Code (1951), § 24–301. However, no such legislation has been forthcoming to govern the field of military law. Moreover, the Secretaries of

---

[4] Of course, there is still ample room for differences of judgment, since psychiatric ailments shade with imperceptible gradations from one into another. Consequently, in a borderline case the diagnosis presented by the forensic psychiatrist may well be swayed by his judgment as to appropriate legal consequences.

[5] Sometimes this is stated as "nature and consequences" of the act. There is some question as to what is added by the latter part of the formula—for many courts seem to hold that knowing the nature and quality of the act signifies merely knowing that it is wrong. See Weihofen, Mental Disorder as a Criminal Defense, 1954, pages 72–4. See also, Zilboorg, The Psychology of the Criminal Act and Punishment, 1954, pages 16–18.

the several Armed Forces have long been empowered to commit "insane persons," and to retain them in medical custody so long as mental disorder persists. 24 USC § 191; White v. Treibly, 19 F2d 712 (CA DC Cir); Overholser v. Treibly, 147 F2d 705, cert denied, 326 US 730, 90 L ed 434, 66 S Ct 38. The grant of this power to a Federal executive branch is indeed unique. Cf. Wells v. Attorney-General of the United States, 201 F2d 556 (CA 10th Cir); Higgins v. United States, 205 F2d 653 (CA 9th Cir), cert dismissed 346 US 870, 98 L ed 379, 74 S Ct 134.

The authority to determine who shall be committed as insane should in practice be linked with the determination of who shall be acquitted as mentally irresponsible—since in the ordinary case, a person properly acquitted by reason of insanity requires treatment in a mental institution. Yet, unless commitment procedures are integrated with the administration of criminal law, there is more than a fair risk that an accused may avoid both the jail and the asylum. Naturally, integration of these procedures can best be achieved by providing that the rules concerning commitment on the one hand, and criminal responsibility, on the other, issue from the same source. Since Congress has expressly entrusted the determination and administration of commitment procedures to the executive branch—of course, with review of its action through habeas corpus—we find no anomaly in concluding that Congress

may also have acquiesced in the formulation by the Chief Executive of standards for determining sanity in trials by court-martial.

However this may be, were the question an open one in this Court—which it is not—we would be hesitant at the present time in adopting for the military establishment the approach of the Durham case. It seems appropriate to supplement our opinion in United States v. Kunak, supra, by noting here some of the reasons for this hesitancy. In the first place, we are—it must be confessed—somewhat troubled by the uncertainty of the criterion set down in Durham to the effect that, to be exculpable, a criminal act must be the *"product"* of mental abnormality. Indeed, there may be some controversy concerning the scientific validity of the premise that a criminal act may be committed which is *not,* in some sense, a product of whatever mental abnormality may coexist. Would not the presence of any abnormality operate to create reasonable doubt in the accused's favor if there is aught to the view—constantly reiterated by psychiatrists—to the effect that human personality may not properly be compartmentalized, and that the McNaughten Rules erred in assuming the possibility of monomanias?[6]

Another possible difficulty is that—under Durham as presently developed —the members of a court-martial would be afforded no guidance in determining when mental disease exonerates—since

---

[6] E.g., Dr. Overholser states: "The old concept of 'monomania,' in which a delusion is found without other mental involvement, is not today accepted by psychiatrists, although the word and concept seem to die hard in the law!" Overholser, The Psychiatrist and the Law, 1953, page 63. See also, Weihofen, supra, pages 109–11. Accordingly, a cut-and-dried rule has been advocated by some, "namely that criminal responsibility in such cases should depend simply upon the presence or absence of a clinically recognizable major mental disorder (psychosis) or gross mental deficiency (imbecility or idiocy) at the time the crime was committed." Weihofen, supra, page 116. Cf. Report of Royal Commission on Capital Pun-

ishment, Appendix 9, paragraph 12(f) (law in Norway), (hereafter cited Royal Commission Report); MacNiven, Psychoses and Criminal Responsibility, Mental Abnormality and Crime, 1944, page 60; TB MED 201, paragraph 4*b* (3). Another commentator, however, requires a *relationship* between the psychological disorder and the crime to be established, and relates: "Thus a patient of mine who heard imaginary voices, broke into and entered a shop, but he did not do so because of the promptings of his imaginary voices, but on account of the promptings of some very real and very undesirable associates." Neustatter, Psychological Disorder and Crime, 1953, page 12.

causation is so broad a concept. Naturally predictability is diminished when results are made to hinge almost entirely on the views of causation entertained by the particular court which tries the accused.[7] Instead of a situation resulting in an equal and uniform application of the law, we might well find one in which an accused's fate would hinge on his financial ability to secure the services of glib counsel and to hire persuasive expert witnesses. Also, is the testifying psychiatrist to be permitted to furnish a medical diagnosis only—with little correlation to the central inquiry before the court—or may he also answer the crucial question of whether the accused's act was "caused" by a mental abnormality?

The comment has been voiced that—realistically considered—the "certainty" of today's rules is wholly illusory in any case—since, in its determination of the question of sanity, a jury tends to follow not the law as enunciated by the trial judge, but rather the dictates of its members' sympathy or want of sympathy with the accused person before it. And it is added in hortatory vein that the law should fall into step—and must discard its effort to limit the jury through the use of narrow tests like those of the McNaughten Rules. We are sure that the anarchy, thus assumed to exist in the jury's processes, is not so widespread as the exponents of this argument would have us believe.[8] Indeed, in many instances the juror, or other trier of fact, may be grateful for the legal rule which serves to aid him in the determination of a difficult question, and thus removes in some measure the strain of moral decision on his part.[9] Furthermore, the argument is self-defeating, for, if instructions on sanity are of no avail in any event, then appellate courts need not concern themselves with the review thereof—and surely should not predicate reversal on supposed errors in their language.

Whatever the vagueness of the Durham rule in its present stage of elabo-

---

[7] Predictability of the result facilitates the disposition of the charges prior to hearing in such a way that the expense and travail of a trial may be avoided. If, however, the matter is to be placed in the jury's lap without guidance to its members, consistency would seem to demand that charges not be dismissed on grounds of irresponsibility without trial—for the reason that this action would invade the jury's province.

With reference to predictability, it is to be observed that Judge Frank has suggested that the craving for certainty in the law reflects deeply-embedded irrational drives. See, e.g., Frank, Law and the Modern Mind, 1930, chapters I, II. Regardless of whether this be true, it seems clear that unpredictability of legal consequences does not generally enhance respect for and confidence in the law—qualities which are highly desirable. Moreover, this unpredictability may serve to encourage frivolous, dilatory defenses, or to provide an added incentive to gamble on crime in the first instance.

[8] Some weight, too, must be given to the effect of rules of law in shaping psychiatric testimony. For ■■■■■ ■ example, a psychopath cannot in military law qualify for exculpation by reason of irresponsibility, for the reason that he is not deemed to possess a mental *defect, disease,* or *derangement*. A psychiatrist who is aware of this legal construction of the term "mental defect, disease, or derangement" could not, therefore, conscientiously link a diagnosis of psychopathy with a conclusion of irresponsibility. Presumably his testimony, if he is called as an expert witness, would reflect this circumstance. We would surmise that, in turn, the finding of the court-martial would ultimately mirror the original clinical diagnosis and the ensuing testimony.

[9] Incidentally, a jury unbridled by legal definitions will not always benefit an accused. For instance, the members of a jury might—when confronted with a prognosis for the accused of incurable insanity—return a conviction and death sentence with euthanasia in mind, or motivating them subconsciously. Cf. Royal Commission Minutes, Q 7395. Also, the jury might in certain cases be moved by fear. See, e.g., Overholser, supra, pages 59–60. The impersonality involved in letting the "law" make a decision on standards of irresponsibility may shield the juror from guilt feelings about his decision.

ration, it might have little practical significance if the test laid down were combined with an insistence on a differentiation between mental defect, disease or derangement, on the one hand, and character and behavior disorders, on the other. We are somewhat unsure of what the Court of Appeals intends in this particular. The opinion in Durham refers to criminal acts caused by mental disease or defect, but no sort of effort is made to juxtapose these against character or behavior disorders. Indeed, it appears that the definitions there of mental disease and defect are pointed principally toward settling a matter which is perhaps unclear under the strict wording of the McNaughten Rules—that is, that a *defect* of the mind, as well as a disease thereof, should serve to free from criminal responsibility. See Royal Commission Report, paragraph 335.

It may be suggested that the test of irresponsibility advanced in Durham is in part, a response to the occasional criticism by psychiatrists that they have been forced in the courtroom to respond to questions which extend beyond their medical expertise. Indeed, certain members of this profession seem at times to wish to do no more than present a medical diagnosis to the jury. In light of the esoteric nomenclature used in the field, and the hypertechnical divergence between various schools of psychiatric thought, as well as because of the complexity and sheer uncertainty of the area under exploration, it can readily be imagined what wholesale want of enlightenment would eventuate from *purely* medical testimony from the witness-psychiatrist.[10] In the unlikely event that the Court of Appeals intended this result, we fear that transplanting this view in the military establishment would render the court member's lot—like that of the policeman in the song—a distinctly unhappy one.

If, however, the medical witness is to be permitted to testify concerning the existence of "mental defect or disease," what criteria are to be furnished him in this regard? In military law as it presently exists, we find in the Joint Definitions of the Armed Forces, supra, a usefully detailed guide. And we incline to believe that, under the law governing the military, the insanity defense usually falls—if fall it does—on the absence of "mental disease or defect." However, the psychiatric witness is wholly lacking in guidance of this nature under most civilian statutes. And there are few judges, we suspect, who would feel sufficiently qualified— or be daring enough—to instruct a witness, or a jury, as to whether the psychiatric diagnosis made amounted in a particular case to mental disease or defect under the law. Under the present treatment of mental responsibility, the witness, or the jury, in the usual civilian court *does* possess the standard that the disease found to be present must be such as to deprive of ability to distinguish right from wrong—or, in jurisdictions where irresistible impulse is accepted, of ability to resist the impulse to do wrong. In light of those criteria of gravity, it is chiefly the psychotic who escapes punishment.

But what if every effort is abandoned to define that "mental disease or defect" which will free from criminal responsibility? In this connection one might inquire into the question of what proportion of serious offenders are mentally normal. It has been argued, indeed, that in a real sense one cannot be deemed normal who lacks the conscience to abide by the laws of society. One legal author writes, for example, that "Psychologists, psychiatrists, and neurologists attribute all crime to mental disease." Dangel, Criminal Law, 1951, § 128, n. 44, page 234.[11] While this statement constitutes an exaggeration, of course, even the medical profession

---

[10] The problem of communication is well treated by Dr. Davidson. See Psychiatrists in Administration of Criminal Justice, 45 J Crim Law 12 (1954).

[11] Such a view was perhaps implicit in the words of one medical writer: "From the psychiatric point of view,

therefore, the criminal as such has ceased to exist." White, Insanity and the Criminal Law, 1923, page 26. Cf. Glueck, Changing Concepts in Forensic Psychiatry, 45 J Crim Law 123 (1954); Neustatter, supra, page 11. Royal Commission Minutes, page 462, paragraph

will agree, we suspect, that the tendency of at least some psychiatrists to attribute crime to mental disease is frequently enhanced—doubtless unconsciously—when they are retained as defense witnesses in a criminal case. Cf. White, Insanity and the Criminal Law, 1923, chapter V.[12]

Those who believe that every crime reflects the existence of mental disorder render the notion of disease meaningless insofar as mental responsibility is concerned.[13] While their conclusion may accord with the premises of deter-minism, it scarcely squares with the assumptions of free will and culpability which underlie our penal legislation. Indeed, many psychiatrists will recognize the justice of this criticism and insist that—in even so serious crime as murder—the accused may be suffering from no sort of mental disease, and will point out as well that there are valid clinical criteria for distinguishing the diseased from the "normal" criminal.[14] Perhaps this is true—despite the existence of ill-defined "wastebasket" categories like that of psychopathy.[15] However, we are inclined to

---

21; also Qs 6395–6. Something like this point of view was recently put, in exaggerated form and ironically, by a British writer, himself neither a psychiatrist nor a lawyer: "In the new Britain which we are building, there are no criminals. There are only the victims of inadequate social service." Evalyn Waugh, Tactical Exercise. The negligible impact of such an approach on a jury is suggested by the following testimony of Lord Cooper:

". . . The case of *Braithwaite* was peculiar, at least to me, because of the fact that there was evidence of an expert that every criminal was suffering from diminished responsibility and should be treated as such —the extreme view which Dr. Slater will be familiar with. The jury objected to that view and found the man guilty of murder, and I sentenced him to death." [Royal Commission Minutes, Q 5521.]

Of interest in the same connection is the following passage from the cross-examination of a Dr. Grierson, a Prison Medical Officer, called by the Crown as a witness in the Trial of Neville Heath: Q: "And the man who did that sort of thing [sadistically killed a young lady] must have been a most abnormal sort of man?" A: "Yes. I have never yet said that any murderer is normal." See Critchley, The Trial of Neville George Clevely Heath, 1951, pages 29, 179. A Dr. Hubert, a prominent psychiatrist, testified for the defense in that case to the effect that Heath suffered from "moral insanity," and therefore should be exculpated under the McNaughten Rules, since he did not, in one sense, "know" that society considered his acts wrong. The cross-examination of the witness revealed strikingly some of the practical difficulties in so broad a conception of what "disease of the mind" should free from criminal accountability.

[12] Dr. White explains frankly that it would be expecting the impossible to anticipate that a witness would be completely devoid of partisanship. In The Show of Violence, 1949, Dr. Wertham, a well-known psychiatrist, hints at the partisanship of the expert, and jokingly comments on testimony in the celebrated Robert Irwin case:

"Physicians of the utmost fame
Were called in turn, and when they came
They answered as they took their fees
There is no cure for this disease."
[See pages 151, 158–9.]

[13] On this premise sanity would be in issue in every case of greater gravity than a traffic offense. Presumably the judge, or in courts-martial the law officer, would then in every case be required to instruct on the possibility of an insanity verdict or finding—and a plea of guilty would be impossible. See United States v. Burns, 2 USCMA 400, 9 CMR 30; United States v. Trede, 2 USCMA 581, 10 CMR 79.

[14] See Royal Commission Report, paragraphs 393–402; cf. Royal Commission Minutes, Qs 2548–51. Cf. Henderson, Psychopathic Constitution and Criminal Behavior, Mental Abnormality and Crime, 1944, pages 106, 110.

[15] See Royal Commission Report, paragraphs 393–4; Weihofen, supra, pages 22–31; Overholser, supra, pages 34–5; Royal Commission Minutes, Q 2509. The Royal Commission also comments: "[M]any of the adherents of the psychoanalytic school would not recognise the fundamental distinction and would regard psychopathic personality as a form of mental disease." Paragraph 395. In many instances, the designation "psychopath" when applied to an

doubt that these distinctions between the mentally normal and the diseased criminal will be readily explicable to juries if the law provides no criteria— or that, if understood, they will be uniformly applied.

In this connection it should be mentioned that the criticism of the law made by numerous psychiatrists fails to take account of the framework in which a decision as to criminal responsibility must be accomplished. For one thing, it must be reached by laymen, quite unversed in psychiatric terminology, and to whom the expert witness must communicate.[16] For another, the adversary system, the excitement of the courtroom, and the rules of evidence do not always conduce to the same decision which might be arrived at by doctors in calm consultation.[17] Further, it has been argued that the physician is in a position—consciously recognized or no —to profit because of a particular diagnosis. And unlike the normal medical situation, an erroneous diagnosis may not carry untoward consequences for the subject's health. Certainly the diagnosis must be made in an area of great complexity, where a theory may readily be found to sustain virtually any position, and where the possibility of a sub-

sequent establishment of error is infinitesimal—since the witness does not, and necessarily cannot, vouch for a later response under treatment. This delineation of difficulties associated with psychiatric testimony in the courtroom shows why the determination of responsibility for *legal* purposes—and there is no *medical* one to which "responsibility" would ever be relevant—may involve policies, and a need for general rules, which might be inappropriate were the procedure for determining responsibility otherwise. Of course, our concept of public trial does not permit substantial alteration in the basic procedure for the establishment of responsibility.

We must concede that the liberalization of the criteria of mental irresponsibility accords with certain penological concepts to the effect that criminals should be "treated" and not "punished" —for liberalization will necessarily augment the number who will escape "punishment." Unfortunately this policy of "treatment" may not have even complete medical validity—although it may be expected to keep overworked psychiatrists even busier than they are at present. It is not at all certain, we believe, that punishment lacks therapeutic value

---

individual signifies: "first, that the person is not insane, neurotic or mentally defective; and secondly, that he has an abnormal character and temperment." Paragraph 396. "A psychopathic criminal may be regarded as a person with a lasting tendency to come into conflict with the law, owing to defects of temperament and character of a persistent kind, who is not suffering from any recognisable mental disease and could not be dealt with under the Lunacy Act." Paragraph 397. With particular reference to the evidence in the record before us, it is interesting to note the following description given the Royal Commission of the aggressive psychopath: " 'The diagnosis is made on persons of habitual abnormal behaviour, behaviour which has been abnormal from childhood; and the disorder of behaviour is seen in abnormal emotional reactivity, so that the individual who has it shows *abnormal outbursts of temper, outbursts of impulsive violence, outbursts of alcoholic excesses often repeated, of suicide attempts and in some*

*cases of homicidal attempts.' "* Paragraph 398.

[16] The significance of communication by the psychiatric witness to the trier of the facts cannot be overemphasized. One criterion for appraising a legal test of mental responsibility must be whether the test lends itself to communication with the jury. Naturally enough this is impossible if the test is phrased in terms which have no meaning for the individual juror within the framework of his own experience. Perhaps one reason for the stability of the McNaughten Rules is that an inability to know right from wrong is a concept that has some meaning for the layman —even though by the psychiatrist it is viewed to constitute an unbalanced focus on one facet of personality.

[17] It is noteworthy, indeed, that one prominent forensic psychiatrist has recently gone on record as favoring the hypothetical question. See Davidson, Psychiatrist in Administration of Criminal Justice, 45 J Crim Law 12, 16–7 (1954).

in many cases. Neustatter, Psychological Disorder and Crime, 1953, page 232; Royal Commission Minutes, Qs 6981–3, 7400–1. Moreover, it is even clearer that—at least in our present state of knowledge—certain types of abnormality often resulting in criminal offenses cannot be "treated" with success. For instance, the expert witnesses before the Royal Commission were highly doubtful that the psychopath could ever be the subject of cure.[18]

Additionally, there are significant factors to be considered quite apart from the rehabilitation of the offender —the goal on which psychiatry, not unnaturally, seems centered. One of these is the deterrence of others by the infliction of punishment, and another the overt manifestation of society's distaste for the act punished. Also, an excessive focus on "treatment," and on criminal behavior as an illness, provides a socially-approved and convenient rationalization for any sort of illicit desire which may cross the mind. Put differently, it provides a convenient role into which the criminal may fit. Cf. Cressey, The Differential Association Theory and Compulsive Crimes, 45 J Crim Law 29 (1954). Then, too, contradiction of the fundamental penological premise of "free will" occurs, which premise—whether or not demonstrable philosophically—seems a pragmatically required assumption, and one that underlies our institutions—beginning, shall we say, with the punishment of the child by his parents.[19]

Regardless of whether the accused offender is to be "punished," there seems little doubt that society should do *something* about him, and should not free him without treatment in lieu of penal action. In England, an accused who is found to have been insane at the time of the commission of the offense charged is consigned immediately to an institution for the criminally insane —and there he remains for such time as the executive authorities consider wise. Neither is the way of the malingerer smooth—for he cannot promptly "recover" his sanity and seek his freedom. Indeed, we are informed that, if the English authorities become convinced of malingering by one found insane by a jury, the inmate will simply be retained in a mental institution for the period he would probably have served in prison by way of sentence. Since the prospects for early release from an asylum are dismal for an accused who is found insane at the time of the offense, and because mental irresponsibility must be pleaded in England,[20] only rarely does an accused find it worthwhile to make use of the plea,

---

[18] Royal Commission Report, paragraph 402. The Commission recommended the establishment of special institutions for psychopaths, a measure which already has been adopted in some European countries. Paragraphs 402, 658–671.

[19] In connection with punishment it is sometimes urged that its value as a deterrent is overrated. For instance, during states of heightened mental tension certain types of individuals may be virtually undeterrable. See, e.g., Royal Commission Minutes, pages 492, 493, 545–6, also Qs 4217–8. The deterrent effect of punishment may, however, be more subtle in operation. For instance, punishment may form a vehicle for upholding an identification between the State, as the large-scale dispenser of law and punishment, and the father, who within the family generally performs a similar authoritarian function. This identification may redound to the support of the State through the operation of attitudes acquired in childhood. Also, punishment is a graphic manifestation of group disapproval of conduct which harms the group; and this disapproval may ultimately be internalized in conscience. Perhaps too, punishment siphons off in a socially acceptable form some of the hostilities, both conscious and unconscious, which might otherwise disrupt society. Under this last analysis some may conceive of punishment as involving a symbolic sacrifice of the offender to society— through which sacrifice tensions are allayed. See also Royal Commission Minutes, Q 7395. The point here is that it is not for this Court to attempt a sweeping revision of so complex a field as penology.

[20] In military law no formal plea is required to raise the issue of insanity, and a suggestion for inquiry into sanity may properly be forthcoming from any one of numerous sources. Manual

**327**

save in capital cases—especially in trials for murder, for which the death sentence is mandatory. Royal Commission Report, paragraph 297. Under these circumstances it is understandable that the Royal Commission should feel no fear that a proliferation of insanity pleas would follow upon a liberalization of the McNaughten Rules.

In the District of Columbia commitment would also follow automatically upon an acquittal by reason of insanity. See, DC Code, supra, § 24–301; Durham v. United States supra, n. 57. However, the road to subsequent release in the District—or in other American jurisdictions where an accused is automatically committed to an asylum following an acquittal by reason of insanity—would probably be much easier than in England. Indeed, a vexing problem in this country has to do with the accused person sufficiently eccentric to exhibit a convincing insanity defense, yet "sane" enough to obtain release on habeas corpus. See United States v. Biesak, 3 USCMA 714, 14 CMR 132. This danger would appear especially great as to the various so-called psychopathic types. These individuals give many manifestations of mental normality—often enough to obtain release following a sanity hearing. See Cleckley, Mask of Sanity, 2d ed.[21] Also, as is revealed clearly in the testimony before the Royal Commission, they raise difficult problems in mental institutions, and interfere to a marked extent with the therapy of other patients who, un-

like the psychopath, may be successfully treated. Cf. Royal Commission Minutes, Q 4381. Many witnesses before the Commission considered that separate institutions should be established for the custody of such persons. Understandably enough, therefore, the superintendent of a mental institution under present conditions possesses a prompting—conscious or unconscious—to release these patients and thus to make available increased facilities for the handling of others whose condition is improvable. As matters now stand, it is not at all unreasonable to suppose that the goal of retaining the psychopath—and like offender—in some form of custody will be furthered by viewing him as criminally responsible, rather than the converse.[22]

If the termination of commitment is comparatively easy to accomplish, and if the rules of mental responsibility are liberal, it is obvious that the premium on malingering is enhanced. Of course, many psychiatrists urge that this danger is exaggerated, and that the malingerer may readily be detected by competent examiners. Several observations seem proper in this connection. In the first place, will not the difficulty of shamming insanity vary, in some measure at least, with the degree of mental illness which must be feigned for a defense purpose? To put the matter in another fashion, will not a feigned *psychosis* be more easily detectible by a trained pschiatrist than some *lesser* mental ailment which is equally sham.[23]

---

for Courts-Martial, United States, 1951, paragraph 122*b*.

[21] As it was put to the Royal Commission, psychopaths " 'are in the most deplorable of all conditions, not sane enough to be at large and not insane enough (in terms of certifiability) to be suitable for Bedlam.' " Royal Commission Report, paragraph 398. See also White, Insanity and the Criminal Law, 1923, pages 107–27, for other instances of accused persons who managed to evade in the long run both commitment and confinement.

[22] "For the present we must accept the view that there is no qualitative distinction, but only a quantitative one, between the normal average individual and the psychopath, and the law must therefore continue to regard the psy-

chopath as criminally responsible." Royal Commission Report, paragraph 401.

[23] Some criminals may be sufficiently abnormal mentally as to have a distinct lead in feigning whatever degree of disorder is necessary for acquittal. Cf. Royal Commission Minutes, Qs 6031–3. More important, while the psychiatrist may be adept in discovering the conscious malingerer, how easily can he detect the etiology of symptoms of abnormality which are not products of the conscious mind. For example, it is known that in certain individuals, physical ailments—often termed psychosomatic—may be developed to satisfy an unconscious desire—such as a craving for attention or sympathy. Similarly amnesia may involve the repression of,

Yet if the lesser disturbance will constitute a defense to crime, it is undeniable that there will be an incentive to pretend its existence. Moreover, the possibility of detecting the malingerer will vary greatly with the availability of trained psychiatrists and the provision of facilities for observation of the accused by a competent examiner.

Against the background of the foregoing discussion several observations may be made which tend ▮ to demonstrate the need for a cautious approach in the military establishment to the liberalization of the criteria for mental responsibility. For one thing, the services of psychiatrists, and the presence of facilities for psychiatric procedures to uncloak the malingerer, may not be readily available in many areas in which courts-martial must function. Thus, feigned mental illness may enjoy better odds of escaping detection. Secondly, the premium on a resort to insanity as a defense is higher in the military establishment than in virtually any other system of law. No more than a reasonable doubt of sanity is required for acquittal. Then, too, commitment does not follow automatically on findings of not guilty by reason of insanity. TM 8–240, AFM 160–42, paragraph 7. In such a case, in fact, the findings of the court-martial are not required to state any sort of conclusion as to mental condition at the time of the offense. As previously noted, the Secretary of the Department concerned may order the commitment "until they are cured" of "insane persons belonging to" that Department. 24 USC § 191. For the Army, the pertinent directive appears to be SR 600–440–1, dated June 7, 1949, and entitled "Disposition of Psychotics." It is unclear whether 24 USC § 191 was intended to be applied to the "psychotic" only; in fact, at the time the statute was enacted, that term may not have been in vogue. Too, in practical operation the Army's SR 600–440–1 may not be limited to "psychotics," as distinguished from other sufferers from mental illness. In any event, the provisions in that Regulation for the disposition of insane persons indicate that the Army, quite understandably, does not propose to undertake extended custody of mentally irresponsible military personnel—although its power to do so has been judicially upheld under some circumstances. White v. Treibly, supra; Overholser v. Treibly, supra. This policy of self-limitation conforms to the general unwillingness to encourage widespread Federal activity in the handling of mentally disordered persons. Wells v. Attorney-General of the United States, supra; Higgins v. United States, supra.

Consequently the risk that a successful malingerer, or a borderline case of mental disorder, will be released from a Federal mental institution is a comparatively good one. That he will be recommitted in turn by the authorities of a state is a possibility which will vary with the jurisdiction and the nature of the disorder. In the case of a civilian who is subject to military jurisdiction—within which category the present accused falls—the odds of escaping commitment to a mental institution, if acquitted by reason of insanity, are especially favorable. We doubt that such a civilian would be considered a person "belonging to" the military establishment involved, within the meaning of 24 USC § 191. Moreover, and unlike a serviceman, Mrs. Smith could not be transferred to an appropriate agency of the Veterans' Administration for disposition and for the institution of commitment proceedings. SR 600–440–1, supra, paragraphs 5a, 6a, 8; cf. 38 USC, chapter 12A,

distasteful memories. See United States v. Olvera, 4 USCMA 134, 15 CMR. 134. If a successful insanity defense is rendered too easy of accomplishment, will not one accused of crime develop symptoms of mental abnormality—although the development will be unconscious rather than conscious? In short, when society puts too high a premium on mental illness, will not such sickness be sought both consciously *and* subconsciously? We doubt that the psychiatrist will be so successful in detecting mental abnormality developed *after* an offense as a variety of subconscious defense mechanism, but not as a form of conscious malingering. In re malingering, see also Neustatter, supra, pages 181–4; Wertham, supra, pages 41–61.

Veterans' Regulation No. 10, section XIV. In fact, Federal authorities would apparently lack the power to hold her for any protracted period of time, save as directed by the sentence of a court-martial. In truth, the only prospect for her "treatment" would seem to lie either in voluntary commitment or in a decision by some state to accept her as its ward. Cf. SR 600–440–1, supra, paragraph 12a.

While the prospect of evading both confinement and long-term commitment would constitute one incentive for a serviceman to gamble on an insanity defense, there are others as well. These include, *inter alia,* (1) a probable exodus from the Armed Service concerned —a pleasing vista in many instances —plus (2) a type of discharge carrying little social stigma and ordinarily permitting the enjoyment of full veterans' benefits. The accused person facing court-martial has literally everything to gain and nothing to lose from an attempt at an insanity defense if he commits an act otherwise criminal.

Weighing these and others of the multiple factors operative in this area, this Court is unwilling at present to essay a liberalization of the current criteria of insanity in military law. Indeed, if we were to envisage a change in the present detailed military distinction between mental defect, disease, or derangement, on the one hand, and character or behavior disorder, on the other, we would feel the need for special wariness. If, however, it is proposed simply to superimpose the Durham causation test on that differentiation, the impact would be of lesser force, and perhaps—as experience accumulates—such a change may appear desirable, either to the President, the Congress, or this Court.

It may be pointed out, too, that military law reflects many mitigating features in its approach to insanity. One sentenced to confinement will necessarily be under careful scrutiny by prison officials to determine whether mental derangement exists, and in suitable cases may be transferred to a facility for the criminally insane maintained by the Federal Bureau of Prisons. See SR 600–440–1, supra, paragraph 9; 18

USC §§ 4241–8. The sentence to confinement will afford a legal basis for retaining a convicted accused in custody while psychotherapy takes place. For borderline types of mental cases, the form of custody—that is, whether accomplished in a penal or a mental institution—will be determined by the facilities available in each and by treatment prospects. These matters cannot be developed adequately at the trial of an accused, but they can be a subject for intelligent decision by military officials, or later by those of the Bureau of Prisons.

The Royal Commission was especially concerned with the possibility that, by reason of the strict operation of the McNaughten Rules a death sentence might be executed on one who is mentally diseased. Of course, this apprehension centered on the English Rule providing that the death sentence is mandatory in murder cases. In the military establishment, however, a mandatory death sentence is not imposed for murder. See Article 118. Moreover, as to premeditation the doctrine of partial responsibility—to be discussed hereafter—applies, and thereby a finding of guilt may be limited to one of unpremeditated murder. Furthermore, in a court-martial there is at all times a ready reception—prior to sentence—of evidence of mental impairment or deficiency of any type, even that which falls short of showing irresponsibility. Manual for Courts-Martial, supra, paragraph 123. Thus, despite the stigma of conviction, which still exists for the person convicted of murder under the traditional rules governing mental responsibility—but who might conceivably be acquitted under the approach adopted for the District of Columbia—we are inclined to believe that other and more compelling considerations argue against accepting the more liberal view until further and broader experience is acquired. Cf. Royal Commission Minutes, Qs 7062–5.

V

Defense counsel have also contended on appeal that, although the Manual provides the desiderata for the deter-

mination of mental responsibility, Mrs. Smith was prejudiced because of the role played at her trial by "Psychiatry in Military Law," an Army Technical Manual, TM 8–240, dated September 20, 1950. This latter publication is a joint product of the Army and Air Force,[24] which, for the Army, superseded a Technical Bulletin dating from October 1, 1945, TB MED 201. It, in turn, was revised in May 1953. It is the defense's view that TM 8–240 pre- ■■■■■■ scribes standards of mental responsibility in addition to, and in some respects different from, those set forth in the Manual for Courts-Martial. They argue further that the Secretary of the Army is without authority to tighten or otherwise to modify the rules governing in this area. Actually the power given the Secretary of the Army by Congress to commit an insane person "belonging to" the Army might well be taken to mean that this official—as well as his superior, the President—does possess authority to *prescribe* rules governing mental responsibility. However, in view of the exercise of the President's authority in this area, and the overriding purpose of uniformity among the Armed Services, we must agree with the defense that the Secretary of the Army does not enjoy rule-making power in this sphere.

Yet this conclusion is inapplicable in the present instance. After a careful examination of TM 8–240, ■■■■■■ as well as its predecessor, we are convinced that there was no purpose on the part of the Secretary to promulgate *new* rules of mili-

tary law, but rather only to interpret for the benefit of service psychiatrists the *existing* ones.[25] Also, the Technical Manual supplies information highly useful to the military psychiatrist, who will probably be called to testify at trials by court-martial. There is certainly nothing in this construction inconsistent with the function of Technical Manuals, which according to the applicable Army directive are designed to

". . . supplement Field Manuals by providing detailed treatment of specific subjects considered necessary for the full accomplishment of required training. They also contain descriptions of materiel and instructions for the operation, handling, and maintenance and repairs thereof; information and instructions on technical procedures, exclusive of those of an administrative nature." [AR 310–20, paragraph 22, dated August 11, 1952.]

We are sure that this technical publication is entitled to "some weight" as an official interpretation of the standards set out in the Manual for Courts-Martial. Indeed this Court has on occasion cited TM 8–240—both in its aspect as an official interpretation of the Manual for Courts-Martial, and as a repository of scientific knowledge compiled by the Surgeons General of the Army and the Air Force. See United States v. Trede, 2 USCMA 581, 10 CMR 79; United States v. Olvera, 4 USCMA 134, 15 CMR 134. However, we have never held—or believed—that the Technical Manual in question was of itself in any way binding on this Court, nor intended

---

[24] AFM 160–42.

[25] The opening sentence of TM 8–240 announces:

"This manual defines and explains the legal standards applied in military law to determine whether a person was mentally responsible at the time of an offense and has the requisite mental capacity to be tried by court-martial." [Paragraph 1.]

Unfortunately the wording of this Manual is more peremptory than that used in TB MED 201, its predecessor. Surveying the Technical Manual as a whole, however, we do not think that it seeks to do more than explain existing rules.

When those rules are identical with those promulgated in the Manual for Courts-Martial, whatever force they possess arises from their original source, rather than their inclusion in TM 8–240. It may be added that, in light of the presumption of lawfulness attaching to official acts, we are little inclined to assume that the Secretaries of the Army and the Air Force sought to arrogate to their Departments an authority in defining insanity which had previously been exercised by the President, and quite probably was intended by Congress to remain with the President.

to be controlling on either a court-martial or an expert witness.

Of special relevance in the trial of the present cause is paragraph 13a of TM 8–240, which emphasizes that a "character or behavior" disorder does not operate to remove an accused's criminal accountability. Accordingly, in its discussion of the notion of "irresistible impulse," the publication states that such a prompting constitutes no defense if it springs from a "character or behavior" disorder—and the latter principle was quoted approvingly by us in United States v. Trede, supra. The draftsmen of the 1950 Technical Manual appeared to consider that their pronouncements were implicit in the demarcation established in the 1949 Manual for Courts-Martial between "mental disease, defect, or derangement," on the one hand, and a "defect of character, will power, or behavior," on the other. Manual for Courts-Martial, U. S. Army, 1949, paragraph 110b. The correctness of this assumption seems confined by a repetition in the 1951 Manual for Courts-Martial of the verbiage used in this connection in the 1949 edition. See Manual for Courts-Martial, United States, 1951, paragraph 120b. Moreover the framers of the latter source—far from being unaware of the exposition presented in TM 8–240—observe that the publication "contains a very good discussion of the whole subject of insanity in the sense we are using the term," and add "This pamphlet will guide both military lawyers and military psychiatrists along the lines of the approved doctrines." Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 167.

The Technical Manual also conforms to the Joint Armed Forces Definitions of Psychiatric Conditions. The former source's interpretation of "defect of character, will power, or behavior" runs to the effect that "pathologic personality, constitutional psychopathy, psychopathic personality" and the like do not exempt from criminal responsibility. TM 8–240, paragraph 13a. The predecessor of TM 8–240 also observed that although "psychopaths are the group of psychiatric cases about whose mental accountability lawyers and psychiatrists have their chief disagreements," "psychopaths are generally held to be responsible for their acts," TB MED 201, supra, paragraph 4d. The Joint Armed Forces Definitions make clear that the generic group mentioned —that is, "character and behavior disorders"—includes those which theretofore had been termed "pathological personality" types, as well as types previously viewed as suffering from a "constitutional psychopathic state" or a "psychopathic personality." See SR 40–1025–2, paragraph 6.

In discussing "irresistible impulse," TM 8–240 sets forth what has been referred to as the "policeman at the elbow" test. Paragraphs 5a, c. Under this test no irresistible impulse is present unless the offense would have been committed had a policeman been present at the time. According to appellate defense counsel, a too narrow test of irresistible impulse is thus provided. Moreover, they contend that the "policeman" test has been altered subsequently by the Army and Air Force. This claim derives from the fact that, in the May 1953 edition of TM 8–240, the test for irresistible impulse is phrased in these terms: whether "the compulsion generating the illness was so strong that the act would have been committed even though the circumstances were such that the accused could expect to be detected and apprehended forthwith when the offense was committed." Paragraph 5a.

In light of our premise that the Secretaries of the Army and the Air Force may not alter the criteria of insanity set down by the President in the Manual for Courts-Martial, and are without power to promulgate new rules for the determination of mental responsibility, we have searchingly examined the so-called "policeman" test. Perhaps the test originated in a remark by Lord Bramwell. See United States v. Kunak, supra. See also Royal Commission Report, paragraph 292. Even in jurisdictions applying only the McNaughten Rules—with their focus on knowledge of the act's wrongfulness—the effect of a hypothetical policeman at the elbow has been a frequent subject of inquiry.

One well-known psychiatrist—apparently with considerable experience in forensic psychiatry in a McNaughten jurisdiction—writes of the question as "old as the hills but ever new: 'Would he have committed the crime if a policeman had been present?'" Wertham, The Show of Violence, 1949, page 155.[26] A legal commentator, too, seems to accept this as the test for irresistible impulse. Burdick, The Law of Crime, 1946, paragraph 213b. See also, Davidson, Forensic Psychiatry, 1952, page 13. But see Royal Commission Report, paragraph 319.

The Manual for Courts-Martial emphasizes that "to constitute lack of mental responsibility the impairment must not only be the result of mental defect, disease, or derangement but must also *completely* deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the act charged." Paragraph 120b. (Emphasis supplied.) Thus, mere *impairment* of the ability to adhere to the right does not constitute a defense, although it may form a mitigating circumstance. Paragraphs 120, 123. The emphasis on *complete* inability to adhere to the right renders it difficult to deem mentally irresponsible an accused person who would not have performed the act had there been an appreciable likelihood that he would be arrested and punished. Also, the fact that the Secretaries of the Army and Air Force considered this a correct exposition of the 1951 Manual for Courts-Martial—and of the previous 1949 Manual which contained like wording—is a persuasive circumstance.

We must concede that our willingness to accept a construction of complete inability to adhere to the right, focused on a hypothetical reaction to the prospect of detection, is heightened by the absence of any sort of suggested alternative interpretation. It may be replied, of course, that the Manual's draftsmen did not intend that this "complete inability to adhere to the right" should possess a fixed meaning. If this be so, then the framers were redundant—for they would not have been required to include the additional test of ability to distinguish right from wrong. We doubt that one could be unable to distinguish right from wrong and at the same time able to adhere to that unrecognized right—although the converse could, of course, be true. Accordingly, we suspect that some refinement of the test of inability to adhere to the right was envisaged, and that there was no sort of purpose to leave it as an amorphous concept, which would in effect equate to the causation test laid down in the Durham case—and thus render the "knowledge of right and wrong" test superfluous.

Still another prop for an interpretation based on the effect of probable apprehension is derivable from one of the arguments used to support a greater liberalization of mental responsibility criteria. That argument runs to the effect that the usual jury may be expected to disregard limiting instructions from the judge, and to act as its members see fit in dealing with an insanity problem. If this premise is to be accepted, then one may inquire what finding a jury would be likely to return respecting the sanity of an accused who, it was established, knew right from wrong with reference to the offense charged and would have done the "right" thing, if he had anticipated detection and apprehension. We surmise that in virtually every such instance the jury would find sanity to exist. The point we are seeking to make is that such an individual as the accused in the imagined case shares qualities so characteristic of one thought of as "normal"

<hr>

[26] Dr. Wertham was apparently referring chiefly to his experience in New York, a jurisdiction where irrestible impulse, as such, is not recognized as a defense—and where the question quoted by him was asked to probe into whether the accused could really distinguish between right and wrong at the time of the offense. Of course, it has been contended that a true irrestible impulse cannot coexist with full ability to distinguish right from wrong. See Hall, General Principles of Criminal Law, 1947, chapter 14; Weihofen, supra, page 96. In practice, in England there is some tendency to strain the McNaughten Rules so as to encompass this point of view. Royal Commission Report, paragraphs 227–8, 232–43, 270.

that most laymen would—in the most catch-as-catch-can fashion—regard him as mentally responsible. And perhaps there is a certain amount of validity to this approach even for the psychiatrist. His body of learning tells us that monomania is a chimera, and that mental disease colors all aspects of personality, albeit with varying degrees of subtlety. The implicit converse, of course, would be that a "normalcy" in one sphere of personality would suggest normalcy in others. In short, a recognition by an accused that the law condemns certain activities, plus a willingness to obey the legal mandate when punishment is in prospect, betokens such a degree of normalcy as to require that he receive the punishment meted out to the "normal" criminal.[27] Cf. Royal Commission Minutes, Qs 6388–9. Absent some indication of contrary intent on the part of the draftsmen of the Manual for Courts-Martial, we are content to follow the same approach.

We observe, too, that penal action is, among other things, designed for the therapy and control of the individual punished. If the accused would have performed the reprehended act despite the prospect of apprehension, an indicium exists that he is impervious to punishment, and that there is but dim probability that as to him it will achieve a valuable rehabilitative result. Conversely, the person who—according to psychiatric testimony—would have been deterred from the act by the likelihood of detection would appear to offer better prospects of improved conduct following the imposition of punishment. Cf. Neustatter, Psychological Disorder and Crime, 1953, pages 230–1. The test

[27] Moreover, there is a sufficient indicium of "normalcy" so as to suggest that punishment might have a therapeutic effect on the future behavior of the individual concerned. On the other hand, if psychiatrists testify that the accused would have done the questioned act despite the presence of a high risk of apprehension, the accused has given an indication that he is impervious to the penal sanctions of society—and thus it may be thought less probable that he would alter his behavior by reason of any punishment he may receive.

Furthermore, in establishing the criteria for mental responsibility, the military establishment must reckon with the widespread skepticism concerning irresistible impulse—especially in connection with serious offenses. For instance, Dr. Wertham comments that "There is with one exception no symptom in the whole field of psychopathology that would correspond to a really ungovernable or uncontrollable impulse. That exception is an obsessive—compulsive neurosis." He then asserts that "[C]ompulsions play no role in criminal acts," and therefore concludes that "It is therefore always bad psychopathology to speak of a compulsive murder or a compulsive suicide." The Show of Violence, supra, pages 13–4. Dr. Hopwood, the Superintendent of Broadmoor, expressed doubts with respect to the frequency of irresistible impulses associated with obsessive-compulsive psychoneurosis which produce anything beyond minor crime—although he conceded that "early schizophrenia may lead to an irresistible impulse, which may be one of the first overt signs of the disease." Royal Commission Minutes, Qs 4291–3. Cf. Royal Commission Minutes, Qs 3926–7. Dr. Yellowlees stated that "An irrestible impulse, in my judgment, does not occur except in the case of a person who has not known the nature and quality of his acts for several years." Royal Commission Minutes, Q 7354. But cf. Royal Commission Minutes, Q 2335. Sir Norwood East disputed especially the occurrence of cases involving "an irrestible impulse, apart from any other indication of mental disorder." Royal Commission Minutes, page 511, paragraph (24), Q 7033. Cf. Qs 2338, 4264. See also Royal Commission Report, paragraph 270. Cf. Neustatter, Psychological Disorder and Crime, page 12.

With such skepticism prevalent among psychiatrists, it is understandable that public opinion would scarcely rally round a wholesale exculpation of "abnormal" persons by a widely-extended application of irrestible impulse. The witnesses before the Royal Commission attached weight to public opinion in connection with problems of penology—although they emphasized that in some areas it might be desirable to undertake attempts to change those opinions. See Royal Commission Minutes, Qs 4194, 4551–2, 6999–7000, 7588–91.

voiced by TM 8–240 conforms to this differentiation.

It may then be asked whether this Court views as correct the test stated in the 1950 edition, or that found in the 1953 version, of TM 8–240. In the only important sense we deem each to be correct since, although differing somewhat in wording, they possess an identical core of meaning. That meaning simply has to do with whether the prospect of penal sanctions would have deterred the accused from the conduct in question—in short, whether punishment had significance for him as to that act. This is made clear in paragraph 5c of the 1950 Technical Manual, which states in explanation of the "policeman" test that "No impulse that can be resisted in the presence of a high risk of detection or apprehension is really very 'irresistible.' " Unfortunately the wording of paragraph 5a of that same document with respect to the "policeman" test might, if taken alone, be construed in a slightly different manner—a circumstance which doubtless produced the clearer phraseology of the later edition of the Technical Manual.[28]

The basic difficulty is that which may arise from a too literal application of the "policeman" test.[29] Perhaps, indeed, the accused would not have committed the offense in the company of a policeman, or of anyone else for that matter, for the plain reason that he wished to act in private—this despite the fact that he nonetheless knew he would be apprehended forthwith. Perhaps, too, he would not have attempted the deed with a policeman at his elbow, because he feared that the policeman would halt him prior to its completion. Cf. Davidson, Forensic Psychiatry, supra, page 8; Neustatter, supra, page 97. Also, perhaps the presence of a policeman would have served to make more vivid to his mind the prospect of ultimate apprehension and punishment. And perhaps, finally, the presence of the policeman would have exercised some other symbolic effect in precluding or delaying the commission of the offense—quite apart from the probability of detection and punishment arising from his presence. Cf. MacNiven, Psychoses and Criminal Responsibility, Mental Abnormality and Crime, 1944, page 53.

These possibilities appear to be somewhat theoretical. Yet psychiatrists on occasion are prone to draw distinctions difficult for lawyers and judges to comprehend. In light of these, it is distinctly possible that the "policeman" test—literally applied—may mislead. Therefore, the wording of the 1953 edition of TM 8–240 should be utilized as a guide for instructions and the like. Indeed, in a case in which it is clear that the trial was premised on an erroneous, overly literalistic construction of the "policeman" test, as phrased in the 1950 Technical Manual, we might well be compelled to reverse. On the other hand, in the absence of an overt showing that the test was construed to mean other than it does—namely whether the accused would have been deterred by a probability of apprehension and punishment—we are sure that reversal is not required. Compare United States v. Biesak, supra; United States v. Johnson, 3 USCMA 725, 14 CMR 143.

While dealing with the concept of "irresistible impulse," it may be desirable to comment on a matter which appeared to disturb the Court of Appeals for the District of Columbia in United States v. Durham, supra. The doctrine under scrutiny was by that court construed to mean no more than an impulse suddenly conceived, and so

---

[28] The framers of the Manual for Courts-Martial, United States, 1951, also realized that the "policeman" test should be applied with discrimination. See Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 167.

[29] The "policeman" test literally applied may even err in favor of an accused in a rare type of situation—one, for example, where a policeman was in fact present at the time of the act but the accused did not anticipate apprehension. A situation of this sort has already reached this Court's attention. There the accused gave a so-called "bad check" with a policeman standing beside him; but the policeman did not realize that the check was bad—and so there was little risk of apprehension to deter the accused.

to exclude a project which had been the subject of brooding, even consideration, for some time. For example, under the notion of irresistible impulse as there interpreted, one suffering from melancholia who—after weeks of reflection[30]—commits a murder should not be held criminally insane. The narrowness of the scope of "irresistible impulse"—as thus construed—was advanced as a reason for adopting the new criteria for criminal responsibility expressed in Durham. For the military establishment, however, there is no sort of requirement that the mental disease which leads to inability to adhere to the right be precipitate in origin. As a matter of fact, Technical Manual 8–240 in paragraph 5a cautions the examiner to beware of a claimed "irresistible impulse" unaccompanied by an appropriate history of prior mental disease. Thus, so far as military law is concerned, we find no worries concerning the existing rule of the nature of those which plagued the Court of Appeals. Cf. State v. White, 38 NM 324, 270 P2d 727. We may add that, in our view, **Headnote 13** the phrase "irresistible impulse" should, for safety's sake, be omitted wholly from instructions to a court-martial. Cf. Royal Commission Report, paragraph 314; Royal Commission Minutes, Q 4009.

## VI

At the trial the Government called numerous expert witnesses to establish that Mrs. Smith was mentally responsible at the time of the stabbing. One Captain Reilly, a neurologist, testified that an electroencephalogram, plus a detailed physical examination of the accused, revealed no indication of organic disease or defect of her central or peripheral nervous system. Thereafter there appeared a Colonel Hessin, Chief of the Neuropsychiatric Service at the

medical facility in which Mrs. Smith had been hospitalized prior to trial. The Colonel stated that he had treated Mrs. Smith in April and May 1952, and later had sat as president of a sanity board which sought to evaluate her mental condition after the slaying. He also testified—without objection—that the board had determined unanimously that Dorothy K. Smith was legally sane when she killed her husband, and had arrived at a diagnosis of:

"... '1. Emotional instability reaction, chronic, severe, manifested by extreme emotional outbursts and suicidal and homicidal manifestations. Predisposition, severe (numerous previous hospitalizations for similar disorder); stress, minimal (recent arrival in the Far East Command); incapacity, minimal. 2. Intoxication, drug, barbiturate and paraldehyde (terminated 4 October 1952). 3. Addiction, drug, (barbiturate). These diagnoses were accepted by the Board.' "

According to Colonel Hessin, this diagnosis revealed only a behavior disorder and not a mental defect, disease, or derangement. He stated that only at one point did the accused's past record reflect a diagnosis of any condition which might possibly be deemed a mental disease.[31] In the course of cross-examination the defense caused the witness to identify various medical records of Mrs. Smith, and thereafter introduced them in evidence.

After the defense had introduced evidence of insanity, the Government called in rebuttal Major Henry Segal, a psychiatrist who had seen the accused at 8:00 o'clock on the morning of October 4, 1952—only a few hours after the killing. Major Segal testified that as a member of the sanity board he had concurred in its conclusions, which—

---

[30] As might be the case in infanticide, "mercy killing," or the execution of a suicide pact.

[31] "Q In your examination of Mrs. Smith, Colonel, did you and the board find any evidence of any mental defect, disease or derangement on the part of the accused?

"A I think at one point in the series of diagnoses made in the past

medical records there was one diagnosis of anxiety reaction.

"Q Is anxiety reaction, as such, a mental disease, defect or derangement?

"A It could be classified under disease.

"Q Under mental disease?

"A Mental disease."

again without objection—he described as unanimous. His opinion was that the accused had been, at the time of the offense, able to distinguish right from wrong and to adhere to the right. He did not believe that she was moved by an irresistible impulse—this because he did not find that she was suffering from a mental defect, disease, or derangement. He affirmed, without defense objection, that he was familiar with the language of TM 8–240, paragraph 5*a*, to the effect that irresistible impulse should not "be used to exculpate aggressive character or behavior disorders"[32]—and stated that he "concurred" in the phrasing of the Technical Manual in this particular. Major Segal also explained his reasons for discounting the possibility that Mrs. Smith suffered from a psychosis due to drug intoxication at the time of the act.

The accused's defense of insanity centered on testimony given by Brigadier General Rawley E. Chambers, United States Army Chief of the Division of Psychiatry and Neurology, under whose care Mrs. Smith had been at various times from 1948 to 1951. Chiefly on the basis of her history while his patient, General Chambers believed that Mrs. Smith—while able to distinguish right from wrong—could not adhere to the right at the time of the offense. According to this expert, had a uniformed police officer been in her presence at the time of the slaying, it would not have caused the accused to restrain herself. On cross-examination General Chambers stated that at various times he

". . . had considered her [the accused] as an anxiety neurosis but as the picture began to unfold, it is

a long-standing pattern and continual struggle with these various episodes, and the final diagnosis, as I recall, was emotional instability reaction with barbiturate addiction."

The General contended that Mrs. Smith suffered from a mental defect, disease or derangement. Trial counsel then directed the witness' attention to TM 8–240, paragraph 13, in which it is stated that character and behavior disorders do not constitute a defense to crime—and the General conceded that some of Mrs. Smith's outbursts did constitute evidence of a character or behavior disorder.[33] At a later point in the cross-examination, General Chambers was requested by trial counsel to utilize "the terms that are contained in the Manual for Courts-Martial and also in TM 8–240, 'Psychiatry in Military Law.'" The General indicated that this was agreeable to him. Thereupon defense counsel commented that to require a medical witness "to express his thoughts in legal vocabulary" would not be "consistent with his training or with his ideas in this case." After further explanation by the trial counsel of his assigned purpose—that is, to facilitate disposition of the issue of legal responsibility—the law officer commented:

"LAW OFFICER: The trial counsel's question calls for the witness to answer as fully as he understands the Manual and the Technical Manual. I am sure that the witness is capable of explaining any further departure that has been mentioned by defense. Objection overruled."

No further comment or objection was presented by the defense in this particular.

---

[32] In the course of a question, the following was quoted to Major Segal by the trial counsel without defense objection:

". . . 'The adhere to the right or irresistible impulse doctrine is not intended to apply to actions committed while drunk, nor to the furies and frenzies of an ill-tempered man who is free of psychosis. Nor should it be used to exculpate aggressive character or behavior disorders. Actually the doctrine is but seldom applicable, and its application will be limited to actions committed by persons with

sick minds— actions perpetuated because of those sick minds.'"
See also United States v. Trede, 2 USCMA 581, 10 CMR 79.

[33] "Q Thank you, sir. Now, these violent outbursts, these drinking sprees, these superficial suicidal attempts, on the part of Mrs. Smith over a period of many months, in your opinion today, General Chambers, are they behavior characteristics or mental characteristics?
"A The definition—they are, by definition, character and behavior disorders."

General Chambers then testified that the accused was in his opinion suffering from a "toxic psychosis" at the time of the stabbing. The witness later conceded that, "with minor deviations," he was "in complete accord" with the diagnosis of the sanity board. Apparently the chief "deviation" lay in the fact that General Chambers believed that "acute drug intoxication" existed at the moment of the offense.

## VII

The defense complains because of the fact that TM 8–240 was used in the cross-examination of General Chambers, as well as in the direct examination of prosecution witnesses. The Manual for Courts-Martial states that the "regulations and official publications" issued by the Department of Defense, or the several departments thereunder, may be noticed judicially—including "general orders, bulletins, circulars, price lists, and court-martial orders." Paragraph 147a. It strikes us that a Technical Manual jointly published by the Army and the Air Force clearly falls within the purview of this provision.

We detect no violation of the Code in this authorization of judicial notice. To be sure, a type of hearsay is involved. At the same time, we find nothing amiss in permitting a court-martial to enjoy the benefit of information compiled by the military establishment and carefully prepared with special reference to military problems. As to a matter of psychiatric learning, certainly no witness could be controlled by anything contained in TM 8–240—and we would hardly anticipate that a court-martial would feel itself bound in any respect. Moreover, on a controverted medical point, the defense would be perfectly free to introduce its own evidence—and as to any expression of views on points of law, this Court can, of course, review for error and for possible prejudice therefrom.

While we acknowledge that civilian courts have refused to permit the contents of textbooks to be brought to a court's attention, we would surmise that, to an appreciable extent, this doctrine reflects a sound recognition that

under any other rule it would be difficult for a judge to distinguish between those treatises which are to be received in evidence, or noticed by a court, and those which are not. For military law there is no such problem of "drawing the line," since the distinction is ready-made as between, on the one hand, "official" publications stemming from units and commands under the Department of Defense, and, on the other, unofficial documents. In reality the problem is little different from that found in United States v. White, 3 USCMA 666, 14 CMR 84, where we upheld the admissibility of a certificate of fingerprint identification, prepared in accordance with the Manual for Courts-Martial, paragraph 143a. That Manual provision dispensed with the need to call an expert witness for the purpose of testifying to the results of fingerprint comparison. As was emphasized at the time, this practice in no way operated to deprive the defense of the right to contravene the evidence of identification contained in the permitted certificate. To notice judicially the contents of TM 8–240 would certainly serve to place before the court the conclusions on certain general psychiatric matters of those experts in the Office of the Surgeon General who had assisted in the preparation of the Technical Manual. But the accused—just as in White—could contest the assertions of these experts, and the court-martial could then elect between conflicting views. The standards of competence and accuracy reflected in the technical publications of the Armed Services are sufficiently high to cause us to doubt that an accused will suffer from having their contents noted by the members of a court-martial. This presumably was also the view of the draftsmen of the Manual for Courts-Martial.

Since we conclude that the Technical Manual might properly have been noticed judicially by the court-martial, we do not doubt that it could with equal propriety be utilized for cross-examination purposes. This seems particularly evident when—as here—the portions read to the court during the course of the direct and cross-examinations enunciated an entirely correct interpretation

of the law applicable to the case at bar.[34] The doubt voiced on one occasion by the defense counsel concerning the use of TM 8–240 scarcely involved an "objection" in any proper sense of the term, and, in light of the entire record, does not present an issue on appeal. Cf. United States v. Johnson, 318 US 189, 87 L ed 704, 63 S Ct 549. At that time, too, the law officer made it clear that the witness was not to be limited by the phraseology of the Technical Manual in the presentation of his medical testimony.[35] The defense, however, made

---

[34] The portions of the Technical Manual utilized in the cross-examination of General Chambers and during the direct examination of Major Segal were those dealing with the distinction between mental defect, disease, or derangement, on the one hand, and character or behavior disorders, on the other. On these matters TM 8–240 sets forth a correct interpretation of the military rules dealing with insanity prescribed in the Manual for Courts-Martial—when read within the context of the Joint Definitions of the Armed Forces promulgated in SR 40–1025–2. The "policeman" test only entered the picture prior to instructions and via the testimony of General Chambers on direct examination to the effect that the accused could not have adhered to the right although a policeman had been at her elbow.

[35] In its entirety the incident was as follows:

"Questions by prosecution:

"Q. General Chambers, continuing the cross examination, I would like first this morning to ask you, please, to use the terms, if you will, in describing the conditions and emotions of this accused, the terms that are contained in the Manual for Courts-Martial and also in TM 8–240, 'Psychiatry in Military Law.' I make that request for the purpose of keeping as much confusion as possible out of the record. Is that agreeable?

"A. Yes, sir.

"DEFENSE (Brigadier General Richmond): May I make this comment, that the pamphlet which counsel had in his hand is a pamphlet entitled, 'Psychiatry and the Law.' We have known military law. We have two distinct vocabularies, one legal, one medical. What this pamphlet is trying to do is superimpose the medical vocabulary upon the legal vocabulary and the two particulars do not exactly fit. The words used by the legal have one connotation, and the words used by the medical have another connotation. The difficulty in harmonizing those two means so that we might understand. Now, to request a medical officer to confine his language to legal vocabulary is extremely difficult, the same as it would be for a lawyer to express his thoughts in medical terms, and it is that position that I wish to bring to the court's attention. Counsel is requesting a medical witness to express his thoughts in legal vocabulary, which I do not think is consistent with his training or with his ideas in this case.

"PROSECUTION: I wish to comment for the record that it is familiar to all of us that the problem which faces this court is the legal responsibility and accountability of this accused. My only purpose in asking the witness, if possible, to limit himself to these terms with which, as Chief of Psychiatry of the United States Army, I am sure he is thoroughly familiar, and I believe is a a [sic] reasonable request.

"LAW OFFICER: The trial counsel's question calls for the witness to answer as fully as he understands the Manual and the Technical Manual. I am sure that the witness is capable of explaining any further departure that has been mentioned by defense. Objection overruled."

To put the matter in perspective more fully, it should be observed that the trial counsel was seeking to elicit from General Chambers a distinction between mental defect, disease, or derangement, on the one hand, and character and behavior disorders, on the other. This witness, as noted in the text, had diagnosed Mrs. Smith as suffering from "emotional instability reaction," although he had at one time inclined toward an "anxiety neurosis" diagnosis. The sanity board also diagnosed the accused as suffering from "emotional instability reaction." The Joint Definitions of the Armed Forces place this psychiatric state under the head of character and behavior disorders, and apparently equate it to one type of psychopathy, which is generally considered to constitute a character and behavior disorder. See SR 40–1025–2, paragraph 6b (1). Under these circumstances trial counsel was thoroughly justified in inquiring of General Cham-

no effort later in the trial to have General Chambers elaborate any matters as to which he considered the Technical Manual to have hindered his testimony.

The law officer instructed the court-martial—undoubtedly on the basis of TM 8–240—to the effect that "If the accused would not have committed the act had there been a military or civilian policeman present she can not be said to have acted under an irresistible impulse." As previously suggested, it is undeniable that such a test may—in some instances and under certain constructions—be misleading. However, this abstract possibility of ambiguity signifies nothing more in the case before us than that a proper defense instruction for clarification of the "policeman" test should, if requested, have been granted. There is absolutely nothing in the record of trial to suggest that a distinction was drawn by anyone between a situation involving a high probability of apprehension, detection, and punishment, on the one hand, and that which would have existed had a policeman been physically present, on the other. The latter hypothesis—it seems perfectly clear—was only taken as illustrative of the former.

Moreover, the real issue at the trial was simply one of whether Mrs. Smith suffered from a "mental defect, disease, or derangement," within the meaning of the Manual for Courts-Martial. General Chambers testified in her behalf, and to the effect that she was suffering from a mental disease—namely a toxic psychosis—at the time of the homicide, and that her conduct would have been no different had a policeman been present. The cross-examination of this witness centered on the existence of "mental disease," within the 1951 Manual's meaning. The Government's witnesses rested their conclusion of sanity on the premise that no mental defect, disease, or derangement existed. They found no toxic psychosis. Their primary diagnosis of "emotional instability reaction" is one which manifestly classified as a character or behavior disorder, within the meaning (1) of the Manual for Courts-Martial, (2) of TM 8–240, and (3) of the Joint Armed Forces Definitions. The last-mentioned publication points out specifically that this diagnosis "is synonymous with the former term 'psychopathic personality, with emotional instability.'"

Indeed, as the case reached the members of the court-martial, it is almost inconceivable that they could have accepted General Chambers' assertion that the accused suffered from a mental disease, within the legal meaning of the term, and yet have concluded that she was able to adhere to the right. Even more improbable is the prospect that the court drew any sort of distinction with respect to the physical presence of a policeman—or viewed the "policeman" test as other than one which graphically embodied the test of whether the accused would have been deterred by the prospect of punishment. After examining the issues as they were framed at the trial, together with the remainder of the instructions, we are sure that the use of the "policeman" test could not have harmed the accused in any manner.

## VIII

The defense claims that reversible error inhered in the denial of a requested instruction:

"The members of the court are instructed that if they believe from the evidence that at the time of committing the act charged in the specification the accused was suffering from such a perverted and deranged condition of her mental faculties as rendered her incapable of distinguishing between right and wrong, or unconscious at such time of the nature of the act charged in the specification

bers, the Army Chief of Psychiatry, how he reached the conclusion stated during his direct examination—at page 299 of the record—that Mrs. Smith was not so free from mental defect, disease, or derangement as to have "any ability to adhere to the right at that time," that is, at the time of the offense charged. The law officer did not unduly box the defense, yet he permitted the trial counsel to go into this matter. Therefore, his ruling was correct.

while committing the same, or where, though conscious of such act and able to distinguish between right and wrong, and to know that the act was wrong, yet her will, the governing power of her mind, was so completely destroyed that her action was not subject to it but was beyond her control, then you must find the accused not guilty of the specification and the charge."

The denial of such an instruction was —they point out—the basis for reversal in Smith v. United States, 36 F2d 548 (CA DC Cir). However, in that case the instructions given by the judge completely ignored the possibility of "irresistible impulse"—as to which there was at the time evidence before the jury. *This* was the reason for reversal.

Here, on the other hand, the law officer had informed the court explicitly that an inability to adhere to the right, as well as an incapacity to distinguish right from wrong, would compel acquittal. While we have conceded that the phrasing used in the presentation of the "policeman" test contained possible ambiguity, we do not at all interpret the requested charge as designed in any measure to clarify *that* ambiguity. Cf. United States v. Boykins, 3 USCMA 806, 14 CMR 224. Further, the phrase in the requested instruction having to do with being "unconscious at such time of the *nature of the act* charged in the specification" might have appeared to the members of the court-martial to introduce a third test of mental responsibility—that is, one in addition to (1) ability to distinguish right from wrong as to the particular acts charged and (2) ability to adhere to the right concerning those acts. (Italics supplied.) Of course, reference is here made to a possible requirement of knowledge of the "nature and quality" of the act performed by the accused.

The McNaughten Rules, as originally stated and as applied in many jurisdictions, would suggest the existence of this third criterion. However, the Manual does not authorize it—with the result that it furnishes no basis for a requested instruction. When an attempt is made to extract a kernel of meaning from the phrase "nature and quality" of the act, the effort is reduced to the following questions: whether (1) the accused knew what he was doing, (2) knew that it was wrong, and (3) knew that it was punishable. Several hypothetical problems may point up possible differences between this standard, and those found in military law.

For instance, let us suppose that an accused, by reason of mental disease, believed himself to be caressing another when in reality he was strangling the latter to death. Rather clearly he would not have been aware of the nature of this act in one sense of the term—and by some interpretations might therefore qualify for acquittal under the McNaughten Rules. Whether he would similarly qualify under the military rule would depend, of course, on whether he recognized as being wrong the act he believed himself to be performing. Thus in the example suggested, if he believed the caress to be wrong, he would be responsible. His responsibility would, however, be no more than partial, since necessarily he would not have been able to premeditate—and thus would not be subject to conviction for premeditated murder.

If the accused had failed to know that the act he was performing was punishable, then he could not have been deterred by fear of punishment. Therefore, under military law, he could not have adhered to the right—and was mentally irresponsible. Thus, the result would be as liberal as any possible under an interpretation of the McNaughten phrase having to do with knowledge of the "nature and quality" of an act. However, what if the accused knew that he would be punished for the act, knew that it was wrong according to law, yet considered his conduct to be right morally? It might be argued in such an instance that he was wanting in knowledge of the "nature and quality" of his act—and thus was irresponsible. However, as the rules of mental responsibility are set down in the Manual for Courts-Martial, we do not believe that the contrast between "right" and "wrong" was meant to extend beyond that which is recognized as right or wrong by the law. An accused's no-

tion that an act is morally right, although he realizes its legal wrongfulness, does not constitute a defense. Here, then, a difference may exist between the approach of military law and that applied in certain civilian courts. In practice, however, we suspect that the ultimate results will frequently be identical under both systems. For example, the prospect of punishment may often fail to deter one who feels impelled to transgress the law because of some high moral purpose—so that inability to adhere to the right will be present. Similarly an individual afflicted with severe delusions of persecution will but rarely be deterred by punitive prospects from attacking his supposed tormentors. Moreover, we are genuinely inclined to doubt the frequent existence of psychiatric ills by reason of which the individual affected recognizes an act to be legally wrong, but deems it justified by some lofty ethical purpose.

The fundamental point here is that in courts-martial a reference to knowledge of the "nature" or the "consequences" of acts can only be confusing. We are sure that the law officer is not obliged to introduce this complication into the trial—even following a defense request. When we consider the generality and involution of the instruction requested, we cannot see that it would have clarified the extensive instructions otherwise supplied at the trial, or would have added aught in the nature of enlightenment. Nor are we able to perceive any phase of the subject, not otherwise the subject of adequate instructions, concerning which the law officer was put on notice by the defense request. Accordingly, we are sure that he was well within his rights in denying the additional charge requested by the defense. United States v. Boykins, supra.

### IX

The defense is certain that error was committed when trial counsel, over objection, was permitted to read, during his closing argument, an extensive extract from the testimony of General Chambers. There is no issue concerning the accuracy of the transcript read.

Accordingly, no error was committed—for the law officer possessed discretion to permit such a reading of testimony, United States v. Chiarella, 184 F2d 903 (CA 2d Cir).

In the case before us General Chambers was the mainstay of the defense. The prosecution appears to have considered that its cross-examination had destroyed completely the value of his testimony. We cannot possibly find cause for complaint on the part of the defense arising from the fact that trial counsel wished the members of the court to deliberate with the testimony of the defense's star witness fresh in their ears. Especially is this true since the law officer informed the defense that if, in the reading of the transcript, "the prosecution brings out here new matter that is inappropriate to a closing argument, you may be heard on that later on." However, no further action was taken by the lawyers for the accused.

### X

Error is also claimed because the trial counsel, in his examination of Government witnesses, brought out that the report of the sanity board had been unanimous—and later adverted to that circumstance in argument. The short answer to this proposal is that the defense wholly failed to object—either to the testimony now in question or to the reference to the matter in argument. However, a like contention is made with respect to a petition for new trial, which in part relies on what is appraised as a conscious suppression of evidence by the prosecution. The predicate for this latter petition is an affidavit of Captain William E. Mayer, a psychiatrist and a member of the sanity board—but one not used by trial counsel as a witness. The defense maintains that he was not called because the Government well knew that he did not agree with the conclusions of the board. Accordingly, they insist that the frequent references at the trial to the "unanimous" conclusions of the body were peculiarly noxious.

Captain Mayer now says that he signed the report because he believed

342

that the conclusions set down therein "met the requirements contained in TM 8-240, 'Psychiatry in Military Law.'" He adds that if the same questions relating to Mrs. Smith's mental responsibility had been propounded to him "in civilian practice, where I was not subject to the limitations imposed by the cited technical manual, I would not have concurred fully in the conclusions reached by the Board, particularly in regard to Mrs. Smith's ability to adhere to the right." According to him "from a *purely medical* point of view," Mrs. Smith was suffering from a "mental defect, disease, or derangement." (Italics supplied.) And from the same point of view, her ability to adhere to the right was *"impaired."* (Italics supplied.) Captain Mayer deposes that he concurred in the conclusions reached by the board because "I believed it quite possible that the presence of a policeman, or of any other person, might, *to a certain extent,* have acted as a deterrent to Mrs. Smith's actions on the night in question. I believe that Mrs. Smith would have *struck* her husband even if a policeman had been present. I do not believe that she would have consciously *stabbed* him to death under those circumstances." (Italics supplied.)

As we analyze this affidavit, Captain Mayer simply indicates that he dislikes the standards of military law with respect to mental responsibility.[36] Further, Captain Mayer was careful to say that he was speaking "from a purely medical point of view." Perhaps this signifies recognition on his part that law and penology must sometimes move beyond considerations which might be involved in the treatment of a single patient. In any event, military and other law must transcend the "purely medical" within this sphere. Captain Mayer speaks consistently of "impaired" ability to adhere to the right. It is distinctly unclear whether he has at any time deemed Mrs. Smith to have been *"completely* deprived" of her ability to adhere to the right when she killed her husband. See Manual for Courts-Martial, supra, paragraph 120*b*. (Italics supplied.) His comments on the "policeman" test in the present context signify little more than that he may have been too literal in his understanding and application thereof. In result, Captain Mayer's distinction between striking and stabbing her husband had a policeman been present suggests in fact that as to the murder charged, Mrs. Smith did *not* lack mental responsibility. Moreover, the Captain has never repudiated the diagnosis of Mrs. Smith as a sufferer from "emotional instability reaction." We have earlier emphasized that, prima facie at least, this diagnosis reveals only a character and behavior disorder, rather than a mental disease producing irresponsibility.

In any event, and although trial counsel had conversed with Captain Mayer prior to the trial, no slightest showing of a conscious suppression of evidence is made. The affidavit of defense counsel in support of the petition for new trial indicates clearly that the members of the sanity board were available to him for consultation. In fact, one of the members of the defense staff was present at the time certain of the board's members signed their report.[37] He argues that trial counsel should have informed him that Captain Mayer had reservations relating to the report he had signed. In our convinced opinion, those reservations—as voiced in the latter's carefully phrased affidavit—are in no way so clear as to create any sort of duty on the part of trial counsel to make disclosure to his opposite number.[38]

---

[36] Captain Mayer might be still more dissatisfied with the standards of those civilian jurisdictions—far and away the majority—which do not recognize "irresistible impulse" as a defense.

[37] The accused was defended by two competent and experienced lawyers, one of them a distinguished retired brigadier general who had held high posts as a judge advocate officer.

[38] The trial counsel and assistant trial counsel explain in affidavits that they did not call Captain Mayer because they considered his testimony cumulative, and not because of a desire to suppress evidence. Perhaps, too, they did believe that he would not be so forceful or convincing a witness as Colonel Hessin or Major Segal. Yet, even so, there was no error, nor want of ethics, in failing to call this witness—who was equally available to the defense.

Since Captain Mayer—and every other member of the sanity board—had signed the report indicating that Dorothy K. Smith was sane, we find no prejudicial misrepresentation involved in the trial counsel's adducing testimony to the effect that the report had been unanimous, and thereafter in commenting on that circumstance in argument. By interposing an objection on hearsay grounds to testimony that the report of the sanity board was unanimous, the defense could have compelled the Government to call Captain Mayer—if the prosecution's personnel wished to place the circumstance of unanimity before the court-martial. Not having utilized this ground for valid objection, the defense has no just cause for complaint.[39]

## XI

The court was specifically instructed by the law officer that: "If, in the light of all the evidence, the ▮▮▮▮▮ court has a reasonable doubt that the accused was mentally capable of entertaining the premeditated design to kill which is involved in the offense of premeditated murder, the court must find her not guilty of that offense." This instruction adequately informed the court of the possibility of partial responsibility —and a consequent finding of unpremeditated murder.[40] Thus, no error inheres in the *finding* of premeditated murder. Cf. United States v. Kunak, supra.

However, subsequent to the trial a civilian psychiatrist, a civilian clinical psychologist, and three military psychiatrists had occasion to observe Mrs. Smith following her transfer to the United States as a prisoner. Any conflict in their views concerning the accused's sanity at the time of the offense has been resolved against her by the board of review—and we find no reason to disturb the conclusion of its members on this point.[41] The experts who examined Mrs. Smith after the court-martial hearing were doubtful of her ability to "premeditate" at the time of the offense. The board of review weighed this new evidence, but nevertheless concluded that premeditation had existed. Since this Court lacks the power to determine the weight of the evidence, even as to the issue of sanity, we are without authority to disturb the board's determination—regardless of whether we might have reached an opposite conclusion.

---

[39] Defense counsel may have chosen to refrain from objecting to the references to the "unanimous" report of the sanity board because they anticipated that the prosecution would then call *all* members of the board as witnesses.

[40] Military law and that declared by the Court of Appeals for the District of Columbia are completely out of phase. That Court has adopted a distinctly liberal approach to total mental irresponsibility, but has reaffirmed its refusal to accept the doctrine of partial responsibility. See Stewart v. United States, 214 F2d 879; Fisher v. United States, 149 F2d 28, aff'd 328 US 463, 90 L ed 1382, 66 S Ct 1318. We, on the other hand, recognize that mental capacity can be wanting to a degree which will not exculpate entirely, but which will lessen the degree of the offense. See United States v. Kunak, supra.

[41] As matters now stand the views expressed with respect to Mrs. Smith's sanity cover the entire spectrum. The Army sanity board set up prior to the court-martial hearing, and another convened subsequent to trial, considered that at the time of the offense the accused was so far free from mental defect, disease, or derangement as to be able to distinguish right from wrong with respect to the act charged, and to adhere to the right. General Chambers, Army Chief of Psychiatry, thought that she could distinguish right from wrong, but that she could not at the time of the offense adhere to the right by reason of a toxic condition. Certain civilian consultants later determined on an inability both to distinguish right from wrong and to adhere to the right. Thus, it must be conceded that, although military law seems more closely linked than other systems with specific psychiatric diagnoses, the area of disagreement among mental experts is still depressingly immense. When they become less so, it is time to consider an adoption of the Durham rule.

## XII

Accordingly the decision of the board of review must be affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (dissenting):

I dissent.

Apart from regarding the elaborate discussion on mental responsibility and the opinion of the United States Court of Appeals for the District of Columbia in United States v. Durham, 214 F2d 862 (1954), as unnecessary to the decision of this case (See: United States v. Kunak, 5 USCMA 346, 17 CMR 346), I strongly disagree with substantial parts of it. However, I need not recite all the particulars of my disagreement because I find here, as I did in United States v. Kunak, supra, an improper use of the technical manual, TM 8–240, "Psychiatry in Military Law."

Mention of the technical manual first occurs in the cross-examination of Brigadier General R. E. Chambers, Chief of the Division of Psychiatry and Neurology, Office of the Surgeon General, United States Army. General Chambers testified for the defense. At various times in a period of years preceding the offense, he had the accused under his medical care. He also examined the medical data respecting the accused that had been obtained shortly before and after the crime. In his opinion, the accused could not adhere to the right at the time of the commission of the offense. Attempting to undermine this opinion, the prosecution sought to limit General Chambers to a statement of his medical opinion, in terms of the definitions of mental disorders enumerated in the technical manual. Later, a prosecution rebuttal witness, Major H. A. Segal, one of the members of a medical board of officers which examined the accused before the trial, was similarly circumscribed in his testimony. This appears very clearly in the following excerpt from his direct testimony:

"Q. In your opinion, does the accused now suffer or did she suffer on the night of 3–4 October with any mental defect, disease, or derangement as defined by TM 8–240?

"A. Under the definition of TM 8–240, it is my opinion that she did not and does not suffer from any mental disease, defect, or derangement."

It also appears that Captain W. E. Mayer, a member of the same medical examining board as Major Segal, signed the medical report, which was frequently referred to at the trial, because he believed that:

". . . the conclusions therein set forth met the requirements contained in TM 8–240, 'Psychiatry in Military Law.' If the same questions relating to Mrs. Smith's mental responsibility had been propounded to me in civilian practice, where I was not subject to the limitations imposed by the cited technical manual, I would not have concurred fully in the conclusions reached by the Board, particularly in regard to Mrs. Smith's ability to adhere to the right.

"4. I am of the opinion and believe that, from a purely medical point of view, at the time of the alleged offense Mrs. Smith was suffering from a 'mental defect, disease, or derangement.' I am of the opinion and believe that at the time of the alleged offense Mrs. Smith was incapable of setting out to kill her husband in a calculated, premeditated way. I am of the opinion and believe that, from a purely medical point of view, at the time of the alleged offense Mrs. Smith's ability to adhere to the right was impaired."

This showing is supplemented by a statement in the report of the second board of medical officers, which was submitted to the board of review in connection with its reconsideration of the case. The statement reads as follows:

"Records of examinations conducted by two expert consultants to the Surgeon General, one in Psychiatry and one in Clinical Psychology, are attached to this report as an exhibit. Both are on the visiting staff for the Neuropsychiatric Service, Letterman

**345**

Army Hospital. It is believed that it is pertinent to note here that Dr. Alexander Simon is a nationally known psychiatrist and at present is Professor of Psychiatry, University of California Medical School, San Francisco, California. Dr. Douglas M. Kelley is widely known in Psychiatry, considered an authority on the Rorschach psychological procedures and has had considerable experience in the medico-legal field. At present, Dr. Kelley is Professor of Criminology at the University of California, Berkeley, California.[1]

"The medical officers who have examined Mrs. Smith and whose names will be signed to these findings, function in a somewhat differently structured medico-legal context than their civilian colleagues who have also examined the accused. By this, it is inferred that the military psychiatrists latitude is in effect, somewhat diminished as to what findings he may make by the established body of medico-legal policy and precedent now codified in part in TM 8–240. It is the impression of the undersigned

that in a civilian jurisdiction a much more liberal interpretation of issues of mental responsibility in crimes of violence is frequently observed. These statements are made in an attempt to explain some of the differences of opinion as to the accused's responsibility expressed by military and civilian psychiatrists."

From the record, it is distinctly evident that the prosecution's expert witnesses did not testify according to convictions based upon their own knowledge and medical experience, but in accordance with strictures of the technical manual. It matters not that the manual may have been intended for instructional purposes only. Clearly, the medical experts considered themselves bound by the manual's terms, to the exclusion of their individual professional beliefs. Under the circumstances, their testimony was so seriously compromised as to require, in the interest of justice, a rehearing. See my dissenting opinion in United States v. Kunak, supra.

---

[1] These consultants concluded that the accused, at the time of the offense, was not able to distinguish right from wrong or to adhere to the right.